In the Matter of the Amended Petition of ALVA STEAMSHIP CO., LTD., Owner of the M/T ALVA CAPE, for exoneration from or limitation of liability.

ALVA STEAMSHIP CO., LTD., Petitioner and Third Party Plaintiff-Appellant,

v.

The CITY OF NEW YORK, Third Party Defendant-Appellee-Appellant,

and

Merritt-Chapman & Scott Corporation, Third Party Defendant-Appellee-Appellant,

and

Walter A. Kidde & Co., Inc. et al., Third Party Defendants.

Nos. 578, 677 and 678, Dockets 79–7621, 79–7653 and 79–7681.

United States Court of Appeals, Second Circuit.

Argued Dec. 13, 1979.

Decided Jan. 30, 1980.

---

William P. Kain, Jr., New York City (Haight, Gardner, Poor & Havens, James M. Hazen, Robert Alexander Hulten, New York City, of counsel), for petitioner and third party plaintiff-appellant, Alva S. S. Co., Ltd.

Robert S. Blanc, New York City (Hill, Betts & Nash, Terence Gargan, Henry F. White, Jr., New York City, of counsel), for third party defendant-appellee-appellant, Merritt-Chapman & Scott Corp.

Wilbur E. Dow, Jr., Lake George, N. Y. (R. Lee Dow, Lake George, N. Y., of counsel), for third party defendant-appellee-appellant, City of New York.

\* Honorable Robert L. Carter, District Judge of the United States District Court for the Southern District of New York, sitting by designation.

Before LUMBARD and VAN GRAAFEI-LAND, Circuit Judges, and CARTER, District Judge.\*

LUMBARD, Circuit Judge:

This case presents a complex of liability apportionment issues surrounding the explosion during salvage operations of the M/T Alva Cape, which had previously been involved in one of the most serious marine fires in the history of New York harbor.[1] Judge Conner found the owners of the vessel liable to the extent of 20% of the damages; the salvors liable for 70%; and the City of New York liable for 10%. We affirm the findings as to liability below with respect to the ship's owner, Alva Steamship Co., Ltd. ("Alva"), and the salvors hired by it, but reverse the district court's finding that the City of New York was negligent; we adjust the allocation of liability accordingly, splitting the City's share proportionately between the owner and the salvor.

On June 16, 1966 the M/T Alva Cape, a British-owned ship of British registration, carrying 133,000 gallons of liquid naptha, collided with the empty tanker Texaco Massachusetts just off the New Jersey coast. The ensuing explosion and fire took the lives of 28 seamen and firefighters and injured many more. The blaze was finally extinguished by the efforts of the largest fleet of sea-borne firefighting equipment ever massed on the East Coast.

Following the disaster, the Alva Cape was towed into New York harbor where, because of the continuing threat of explosion and fire posed by flammable liquids and gases on board, she was moored in the Federal Explosives Harbor in Gravesend Bay, off Brooklyn. At this point, Alva, acting through its New York agent, Navcot, Inc., hired the well-known salvage firm of Merritt-Chapman & Scott ("MCS") to undertake salvage operations on the Alva Cape. The goal of the shipowners was to

1. The facts involved in this case are also reported in our decision in *In re M/T Alva Cape*, 405 F.2d 962 (2d Cir. 1969), in which this court held that the City of New York was a proper party to this action.

render the hull gas-free so that it could be scrapped or repaired, if repair was found to be economically feasible.

MCS began operations by unloading most of the Alva's remaining cargo by the "over-the-top" method. But by the time that only about two to three thousand gallons of liquid naptha remained, on June 23, this method had to be given up and the use of the Alva's on-board pumps resorted to. On June 26, Fire Department officials observed that the ship was leaking liquid naptha into the waters of the harbor. They decided that the best way to meet the hazard of the explosion or fire from the leaking naptha was to "inert" the cargo hold of the Alva Cape through the introduction of a gas such as nitrogen or carbon dioxide. On June 27, the Board of Fire Prevention of the City of New York Fire Department issued an order requiring such inerting.

MCS and Navcot agreed to perform this inerting procedure although officials of both entities made no secret at the time, and testified at trial, that they thought the Fire Department order was a foolish one. This belief was based on their view that inerting was unnecessary, impractical and in flagrant disregard of a better alternative, that of "butterworthing," or flushing out the cargo hold with warm water. But MCS and Navcot determined to go ahead with a "token" inerting procedure by pumping a minute quantity of $CO_2$ into the Alva's hold.

MCS contacted Walter Kidde & Co. to arrange for the delivery, on June 28, of ten 50-gallon canisters of liquid $CO_2$ (an amount far smaller than the one to two hundred tons of liquid $CO_2$ needed to do the job as specified by the Fire Department order). The Kidde salesman, Becker, inquired as to the use to which MCS was going to put the $CO_2$ and the "token" operation planned on the Alva was described by Varnum, an MCS executive. Becker's response was that such an operation would be extremely dangerous because unless the apparatus used to fill the cargo hold with gas was properly grounded, an electrical discharge might trigger an explosion. Becker recommended that MCS

delay its plans. Varnum told Becker to mind his own business.

The canisters of $CO_2$ arrived at the Alva early in the afternoon of the 28th. The danger the Kidde salesman referred to was the same danger the entire inerting operation was being undertaken to nullify—the danger of a spark from the operation of mechanical equipment igniting the flammable gases accumulating in the Alva's cargo tanks. The way to avoid this danger was simple, as any marine chemist knew. The part of the canister that came into contact with the gases in the hold should have been grounded to the ship with copper wire, so that any electrical charge built up around the point of contact would not be free to ignite an explosion. Lee, a marine chemist employed by E. W. Seybolt & Co., Inc., a firm retained by MCS, warned Varnum of this problem in a telephone call on the morning of the 28th. Varnum told him it was too late for a change in plans. Captain Zickl, MCS's salvage master in charge of operations aboard the Alva, had no personal knowledge of the dangers involved in the inerting procedure, and Varnum did not transmit to him the warnings of Lee and Becker.

The first canister of $CO_2$ was discharged into the Alva without incident. When the operation began, Rush, the Fire Department's representative, became aware of the fact that MCS and Navcot did not intend to perform the inerting operation in the manner ordered by the Fire Department. He left on a Fire Department launch to telephone his superiors to report this situation. His own training as a fireman, and his experience using $CO_2$ as a safe fire-fighting tool in ordinary land-based fires, was not such as to lead him to think that the operation being carried out in his absence was dangerous.

Within seconds after discharge of the second canister of $CO_2$ began, an electrical charge that had accumulated at the head of the nozzle discharged itself as a spark and came into contact with the naptha gas in the Alva's hold. Once again, for the second time in two weeks, the ship was rocked by

powerful explosions. Four salvage workers were killed and several more injured.

The day after this second fatal incident aboard the Alva the Fire Department met with officials of Navcot, MCS and the Coast Guard. The Fire Department ordered Navcot to remove the still dangerous hull of the Alva, in which naptha liquid and gases remained in an uncontrolled state, from New York harbor within 24 hours. Navcot requested more time in order to remove certain rented salvage equipment left intact by the explosions. The request was denied, but, acting under purported Coast Guard permission, an MCS employee attempted to commence removal of the salvage equipment. Policemen barred his attempt with the threat of arrest. Soon afterwards Navcot gave up its efforts to salvage anything of the remains of the ill-fated ship, and had the Alva Cape towed out to sea, where it was sunk by gunfire from a ship hired for that purpose.

After the accident of the 28th, the parties involved contributed to a fund to cover any damage awards won by the representatives of those injured and killed in the accident, with the understanding that the amount and proportion of contributions made at that time were arbitrary and would be reallocated *inter se* following a judicial determination of liability. Thus, our allocation in this case will result in a retroactive reapportioning of the contributions made to the liability fund, as well as control the proportions to be paid by the parties in any future judgments against them.[2]

The owner of the Alva Cape, Alva, contends that it should bear no liability at all for the accident of the 28th. Its strongest argument is based on Judge Conner's finding that Alva, although it knew the inerting operation as commenced by MCS was "futile", did not know that it was dangerous. However, we believe that Judge Conner's attribution of liability to the Alva's owners is fully supported by the facts and the law.

Alva was aware of the Fire Department order mandating the presence of a marine chemist at the inerting operation. A competent marine chemist would have been aware of the danger of an explosion sparked by static electricity during the inerting operation, and in fact Lee warned MCS of this danger on the 28th. The Fire Department order had the force of law, as we held in our earlier decision in this case, *In re M/T Alva Cape*, 405 F.2d 962, 968 (2nd Cir. 1969), and the shipowner's failure to comply constituted negligence per se.[3]

[2] A second basis for Alva's liability in negligence is its vicarious liability for the negligence of its independent contractor, MCS. Ordinarily, of course, an employer is not liable for the negligence of an independent contractor, but there are several well-recognized exceptions to this rule. One of these is that an employer may remain liable for the negligence of an independent contractor who performs a duty imposed by statute on the employer. Although Judge Conner held that "although the Fire Department inerting order had the force of law . . . the duty to inert was not one directly imposed by a statute or ordinance," (Jt.App. Vol. I, p. 700a), we disagree; in our view, because the Fire Department order had the force of law the shipowners were under a non-delegable duty to

---

2. Walter A. Kidde & Co., one of the contributors to the fund, is not involved in this litigation, as it reached a settlement with the other parties.

3. The Fire Department order, No. 2462–6, read as follows:

   Certifications of the inerting shall be obtained from a Marine Chemist with reports of periodic checks every three hours until removal of the vessel from the boundaries of the City of New York.

On its face, this order may be ambiguous as to whether the presence of a marine chemist is required at the site of the inerting before the time the first three-hour period elapsed. Judge Conner found, however, that the order "required the presence of a marine chemist to check the inerting operation", and there is no indication that MCS or Alva intended to have a marine chemist present at the site at any time.

see to it that the inerting procedure was performed with the safeguards mentioned in the order. Alva may not have been under a statutory duty to perform the salvage operation at all, but once it determined to do so any negligence in complying with the inerting order can be imputed to it. Failure to have a marine chemist oversee the inerting process and willful refusal to perform more than a token inerting, were both acts of negligence by MCS, which can be imputed to Alva.

■ Moreover, we have no doubt that the salvage of 30,000 gallons of liquid naptha from a damaged hull whose doors, gaskets and hinges could not be made secure because of a prior explosion was an inherently dangerous activity. Where the activity performed by a contractor is an inherently dangerous one, the negligence of the contractor may be imputed to the employer. Our conclusion is that MCS's negligence may be imputed to MCS's employer, the owner of the Alva Cape.

■■ We now turn to MCS's negligence. MCS argues that if the shipowners were under a non-delegable duty, then the shipowners should be held fully liable. We disagree. An independent contractor remains liable for his own negligence even though the law also imposes liability on the owner under the non-delegable duty rule. Here, moreover, Alva and MCS entered into a contractual agreement when they contributed to the liability fund which provided for an allocation of liability according to the decision of the courts.

■ Both the shipowners and MCS make several arguments whose gravamen is not that they should be entirely relieved of liability, but rather that their relative shares of liability should be reduced. Alva argues, for example, that in hiring MCS it hired the most reputable salvage firm in the United States and that thus it was entitled to rely on MCS's judgment. MCS argues that the shipowners, their agents (Navcot), and their underwriters effectively exercised control over the operations during the period in question. MCS is able to point to its contract with Navcot to support this argument, since, unlike the "no cure, no pay" contract that is standard in the salvage trade, this contract was on a *per diem* basis and gave MCS somewhat less than the quantum of control over the vessel customary under the typical salvage agreement. But Judge Conner resolved these mutually conflicting claims by allocating liability 20% to Alva and 70% to MCS. In our view, the allocation of greater liability to MCS is justified because MCS had actual knowledge of the danger posed by the inerting operation from two independent sources, and neglected to take action based on this knowledge or transmit the warning to Alva. We see no reason to upset the district court's considered weighing of the arguments on all sides, recognizing as we do that any percentage allocation in a negligence case is necessarily a procedure which involves inexact estimates.

Finally, we come to the role played by the City of New York. In our earlier decision, *In re M/T Alva Cape*, 405 F.2d 962, 966–67 (2d Cir. 1969) we held summary judgment in favor of the City improper under section 8 of the New York Court of Claims Act, in which the State of New York waived sovereign immunity in tort for its actions and those of its municipal subdivisions. We relied for our holding on "the closest state precedent," *Weiss v. Fote*, 7 N.Y.S.2d 579, 200 N.Y.S.2d 409, 167 N.E.2d 63 (1960), in which the New York Court of Appeals held that a municipality could not be held liable in tort for the allegedly faulty design of a traffic light in the absence of proof that the "design lacked a 'reasonable basis' or had been adopted without 'due care.'" 405 F.2d at 967.

Judge Conner did not apply the *Weiss v. Fote, supra*, standard to the facts in this case. The basis on which he found the City of New York liable was not the reasonableness or unreasonableness of the Fire Department order, with which our prior opinion assumed any inquiry into the City's liability would be concerned, but rather the actions of Fire Department officer Rush at the scene of the accident on the 28th. Judge Conner found as a fact that "Rush recognized that the operation being con-

ducted was useless" but also that Rush "did not also realize it was dangerous."

■ Exercising our power in marine negligence cases to review a lower court's finding on the ultimate question of liability in negligence, *Mamiye Bros. v. Barber Steamship Lines, Inc.,* 360 F.2d 774, 777–78 (2d Cir. 1966), we can find no basis for holding the City of New York liable under the *Weiss v. Fote, supra,* standard recognized in our prior decision in this case. Since Rush merely knew that the inerting procedure as it was being carried out by MCS was "useless", his decision to seek instructions from his superiors rather than order a halt to the operations on his own authority cannot be said to have been lacking in due care. Nor was there any reason to believe that the City was under a duty to supply a fireman who would have had knowledge of the danger of the inerting procedure as carried out by MCS. The fact that the Board of Fire Prevention ordered that a marine chemist participate in the inerting procedure indicates the contrary; that the City knew and took reasonable steps to counter what it recognized would have been the ignorance of laymen (including firemen) as to the explosive hazards posed by the inerting procedure.

It is true that some passages in Judge Conner's opinion come close to characterizing the City's decision to order the inerting as lacking a reasonable basis. He states that the Fire Department order was "impractical but not dangerous if properly carried out." (Jt.App. at 697a). Elsewhere he states that butterworthing would have been a far superior means of achieving the desired goals. (Jt.App. at 690a). But we cannot say that the record shows that the City's decision to order the inerting rather than butterworthing was without "reasonable basis" or taken "without due care." We conclude, therefore, that no liability should be imposed on the City of New York for its actions prior to the explosions on the 28th. The City's 10% share is reallocated between the two negligent parties, MCS and Alva, in the same proportion as their relative negli-gence as determined by the district court, resulting in 77.7778% liability to MCS and 22.2222% liability to Alva.

Alva argues that since, in its view, the sinking of the Alva Cape at sea on the 2d of July was a direct result of the accident on the 28th, the parties held liable for that accident should bear in like proportion the losses caused by the destruction of the Alva at sea. Judge Conner found against Alva, ruling that, first, the Alva was worth nothing after the accident on the 28th, so that there were no damages to be apportioned with respect to the eventual intentional sinking of the ship; and second, that the Alva's owners could have, but did not, attempt further salvage outside the port of New York, and thus the accident of the 28th was not the proximate cause of the final loss of the ship.

■ We agree with Judge Conner that the Alva's owners are not entitled to any recovery from the other parties on the theory put forward above, though we reach this conclusion for somewhat different reasons. The district court reasoned that the tender of abandonment by the owners of the Alva to the underwriters of the ship's insurance on the 27th—a day *before* the explosion of June 28—and the fact that the underwriters rejected this tender, is evidence that the most knowledgeable parties at the time thought the Alva was worthless. But a tender of abandonment, if accepted, brings to the underwriters rights and responsibilities of uncertain potential financial consequence. We cannot say that the making or rejection of a tender of abandonment by itself shows that a hull is devoid of scrap or salvage value as a matter of law.

On the other hand, we do not view the stipulation by the parties that the hull had a salvage value of $155,000 after the explosion as dispositive either, since the stipulation was conditioned on the hull's being "gas-freed". "Gas-freed" is precisely what the Alva never was. We give full weight, however, to a second stipulation, which

Judge Conner disregarded,[4] that salvage outside the waters of New York harbor proved "impractical."

We note that, first, salvage inside the waters of New York harbor had been forbidden by the City of New York. Alva's owners indicated they would comply with this order, although they sought its modification in some respects. Second, the parties agreed salvage was impractical outside New York harbor. Third, the only evidence in the record as to the scrap value of the Alva Cape required that she be gas-freed, a condition it was unlikely she would ever attain, since further salvage operations anywhere were impractical. We conclude that there is no evidence in the record that the Alva Cape had any value after the explosions of the 28th, because she could not be scrapped without being gas-freed, and she could not be gas-freed without further salvage, and further salvage was impractical. Since scrap and repair were equally unfeasible, the conclusion is compelled that the Alva was worthless on the 28th.

One final detail remains to be discussed. On board the Alva Cape when she was sunk at sea was rented salvage equipment to the stipulated value of $38,000. This equipment was undamaged and could have been easily removed but for the order by the New York City Fire Department prohibiting MCS from removing the machinery while the Alva remained in New York harbor. Because we conclude that the City's order was reasonable, we do not think the City should bear any part of this loss; but because the loss of salvage equipment on board the vessel due to reasonable government action could have been foreseen at the time of the original negligence by the parties, we think both negligent parties—Alva and MCS—should bear of the burden of this loss in the same proportion they bear of the burden of overall liability. We reject Judge Conner's reasoning that the loss of the salvage equipment was not proximately caused by the original negligence because of the intervening action of the owner in failing to attempt salvage beyond the confines of New York harbor, because it involves ignoring the agreed-upon stipulation of the parties referred to above [5].

In light of the foregoing, the remaining parties with interests in the indemnity fund will readjust their accounts with one another in such a way as to reflect this court's allocation of liability in the proportion of 77.7778% to MCS and 22.2222% to Alva; in addition, MCS will pay Alva 77.7778% of the $38,000 value of the lost salvage equipment, whose value Alva has already paid to the owners of the equipment.

Affirmed in part, reversed in part, modified in part.

---

4. Judge Conner relied on expert testimony by MCS's salvage master, elicited *sua sponte*, to the effect that there were no technical reasons why salvage operations on the Alva could not have been conducted outside the waters of New York harbor. In our view, the stipulations of the parties must, instead, control.

5. Although Alva argues that the City's order was *ultra vires*, Judge Conner did not so find and the evidence supports the view that although the Coast Guard may have had ultimate authority in the situation, it never exercised this authority by countermanding the City's order, despite notification. Moreover, in our view it is clear that the City's order had a reasonable basis and had been promulgated after due care. There had already been two major explosions involving the Alva Cape within the confines of New York harbor, and the ship's dangerous cargo remained unsecured. Those responsible for the Alva's safety, her owner and salvor, had already demonstrated their lack of competence and disregard for safety. In such circumstances, the Fire Department's action cannot be said to have been unreasonable or careless.