**MILLER YACHT SALES, INC., Plaintiff,**

v.

**M.V. VISHVA SHOBHA, her engines, boilers, etc., The Shipping Corporation of India, Ltd., Pittston Stevedoring Corp., and M. P. Howlett, Inc., Defendants.**

**No. 77 Civ. 5363 (CHT).**

United States District Court,
S. D. New York.

Aug. 12, 1980.

Donovan, Maloof, Walsh & Kennedy, New York City, for plaintiff Miller Yacht Sales, Inc.; James J. Ruddy, Charles C. Goodenough, New York City, of counsel.

Walker & Corsa, New York City, for defendant The Shipping Corp. of India; Christopher H. Mansuy, LeRoy S. Corsa, Vera E. Weinberg, New York City, of counsel.

Bigham, Englar, Jones & Houston, New York City, for defendant Pittston Stevedoring Corp.; James S. McMahon, Richard J. Cohan, New York City, of counsel.

Poles, Tublin, Patestides & Stratakis, New York City, for defendant M. P. Howlett, Inc.; John J. Devine, Jr., New York City, of counsel.

## OPINION

TENNEY, District Judge.

In this admiralty action, Miller Yacht Sales, Inc., the owner and consignee of a motor yacht, sues the M.V. VISHVA SHOBHA, The Shipping Corporation of India, Ltd. ("SCI"), Pittston Stevedoring Corp. ("Pittston"), and M.P. Howlett, Inc. ("Howlett") for damages to the yacht plus interest, costs and disbursements. The Court will address the liability of the defendants as well as the extent of damages. The parties agree that the yacht was damaged in the amount of $21,250.00, but the defendants argue that applicable clauses in the Bill of Lading limit any liability to a much smaller amount. For the reasons given below, the Court concludes that the defendants SCI, Pittston, and Howlett are liable to Miller Yacht Sales for limited damages to the yacht, that SCI is entitled to indemnification from Pittston and Howlett, and that such damages are chargeable 70% to Howlett and 30% to Pittston. SCI is also entitled to its costs, including attorneys' fees, to be assessed against Howlett and Pittston in the same proportions.

## Background

The following background is not in dispute. Miller Yacht Sales is a corporation organized and doing business in New Jersey. SCI is the owner of the M.V. VISHVA SHOBHA and is engaged as an ocean carrier of merchandise for hire. Pittston is a New York corporation engaged in stevedoring and terminal operation. Howlett is a New Jersey corporation engaged in the business of crane operation.

On July 1, 1976, SCI issued Bill of Lading No. 1 for one diesel motor yacht to be shipped on the deck of the M.V. VISHVA SHOBHA from Keelung, Taiwan to New York, New York. The yacht was consigned to the order of the Bank of New York with Miller Yacht Sales as the "notify party." After July 1, 1976, the bank negotiated the Bill of Lading to Miller Yacht Sales.

On August 9, 1976, the yacht was discharged from the M.V. VISHVA SHOBHA at a pier in Hoboken, New Jersey. Pittston provided the stevedoring services, including supplying some of the gear for discharge: the slings, straps and spreader bars. Howlett provided and operated the floating crane used to discharge the yachts aboard the M V. VISHVA SHOBHA into the water. After the crane had lifted the yacht in question from the deck of the vessel and had swung it beyond the vessel's rail, the yacht fell into the water and was damaged. At the conclusion of trial, the parties stipulated that the damage to the yacht amounted to $21,250.00.

The parties dispute the cause of the yacht's fall into the water. Miller Yacht Sales claims that both Pittston and Howlett negligently caused the yacht to fall. It claims that Pittston failed to rig the yacht properly for discharge by neglecting to use safety lines, which allegedly would have prevented the lifting slings from moving from their proper positions. Howlett, in the course of discharging the yacht, allegedly allowed it to become hung up on a line running from the M.V. VISHVA SHOBHA to the crane, causing the yacht to slip from the slings and fall into the water. Miller

Yacht Sales also argues that it has established its prima facie case against the carrier by proving that the yacht was delivered to the vessel in good condition, but delivered at the destination in damaged condition.

SCI agrees that both Pittston and Howlett caused the damage to the yacht: Pittston failed to secure the slings in position with safety lines, and Howlett hit a mooring line, allowing the aft sling to move forward—in the absence of safety lines—and fall into the water. SCI claims that both Pittston and Howlett were negligent and that the negligence of each caused the damage to the yacht.

Pittston claims that Howlett caused the yacht to fall by hitting a mooring (or "breast") line. It further claims that safety lines could not have prevented the sling from moving forward and thereby kept the yacht from falling into the water.

Howlett denies any negligence on its part. It claims that the yacht fell because

the aft sling, in the absence of safety lines, slid forward, unbalancing the yacht and causing it to fall. Howlett denies that it allowed the yacht to touch the breast lines or anything else.

Although the parties stipulated that the yacht was damaged in the amount of $21,-250.00, Trial Transcript ("Tr.") 166, they dispute the extent of liability, if any. They disagree as to what law governs the rights and liabilities of the parties and as to the effect of provisions in the Bill of Lading that purport to limit liability. Miller Yacht Sales argues that the Harter Act of 1893, 46 U.S.C. §§ 190–196, governs this action.

SCI contends that the Harter Act has no application once SCI has completed its obligations under the Bill of Lading. Rather, it argues that the Indian Carriage of Goods by Sea Act (1925) ("Indian COGSA"), SCI's Exh. 7, made applicable by the Bill of Lading,[1] governs this case. Under article IV(5) of that Act[2] and under the Bill of Lading ¶ 19,[3] SCI argues, its liability *vel non* is

---

1. The Bill of Lading ¶ 27 provides:
   LAW APPLIABLE: This Bill of Lading shall be governed by the laws of the Union of India and in accepting this Bill of Lading, the shippers and consignees expressly agree to all its stipulations, exceptions and conditions by him or them stamped or printed as fully as if signed by him or them.

   The "CLAUSE PARAMOUNT" provides in part:
   All the terms, provisions and conditions of the Indian Carriage of Goods by Sea Act 1925, and the Schedule thereto are to apply to the contract contained in this Bill of Lading, and the Company are to be entitled to the benefit of privileges, rights and immunities contained in such Act, and the schedule thereto as if the same were therein specifically set out. If anything herein contained be inconsistent with the said provisions it shall to the extent of such inconsistency and no further be null and void. It is hereby expressly further agreed in pursuance of the provisions of Article 7 of the Schedule to the said Act, that the carrier's liability, prior to the loading on, and subsequent to the discharge from the ship shall be governed by the conditions and exceptions of this Bill of Lading.

   The Bill of Lading was introduced as Plaintiff's ("Pl.'s") Exh. 1A. Relevant clauses appearing on the reverse side of the Bill of Lading were introduced in retyped form as SCI's Exh. 6.

2. Article IV(5) provides in part:
   Neither the carrier nor the ship shall in any event be or become liable for any loss or damages to or in connection with goods in an amount exceeding 100*l*. per package or unit, or the equivalent of that sum in other currency, unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading.

3. The Bill of Lading ¶ 19 provides:
   CARRIERS LIABILITY IN RESPECT OF VALUABLE CARGO:
   In case of any loss or damage to or in connection with the goods exceeding the value £ 100 sterling per package, or in case of goods not shipped in packages, per customary freight unit, the value of the goods shall be deemed to be £ 100 sterling per package or per unit, on which basis the freight is adjusted and the carrier's liability, if any, shall be determined on the basis of a value of £ 100 sterling per package or per customary freight unit or pro rata in case of partial loss or damage unless the nature of the goods and a valuation higher than £ 100 sterling shall have been declared in writing by the shipper upon delivery to the carrier and inserted in this bill of lading and extra freight paid if required and in such case if the actual value of the goods per package or per customary freight unit shall exceed such declared value, the value shall nevertheless be deemed to be

limited to 100 pounds sterling, or approximately $180.00 on the date of the damage to the yacht. Finally, SCI claims that Pittston and Howlett are liable to SCI for any liability it may have to Miller Yacht Sales, as well as for SCI's costs and attorneys' fees.

Both Pittston and Howlett claim the benefit of the package limitation in the Bill of Lading ¶ 19, quoted in n.3 *supra*. They claim this benefit by virtue of paragraph 32 in the Bill of Lading, which extends the "exceptions and immunities" of the carrier to its servants and agents.[4] Howlett also claims the benefit of the limitation of liability provision in article IV(5) of the Indian COGSA, quoted at n.2 *supra*. Howlett states that the Harter Act may be applicable to this action, but it argues that the limitation provision in the Bill of Lading is valid under the Harter Act. The provision is valid, it reasons, because the limitation is based on an agreement between the carrier and the shipper in which the latter was given the option of choosing a higher value for its goods and paying a higher shipping rate and, secondly, because the limitation amount is reasonable under case law. Howlett also contends that its liability is limited by the terms of its contract with SCI.[5] Finally, Howlett contends that its liability to SCI for indemnification, if any, should not include attorneys' fees and costs.

*Testimonial Evidence*

Miller Yacht Sales introduced the Deposition of Robert P. Selby, taken December 15, 1978 ("Selby Dep."). Selby also testified at the trial on behalf of Howlett. He has been employed by Howlett since 1961 and has been a crane operator for about twelve years. On August 9, 1976, he was operating

the declared value and the carrier's liability, if any, shall not exceed the declared value of and any partial loss or damage shall be adjusted pro rata on the basis of such declared value.

4. Bill of Lading ¶ 32 provides in part:

Exceptions and immunities of all servants and agents, of the carrier it is expressly agreed that no servant or agent of the carrier (including every independent contractor from time to time employed by the carrier) shall in any circumstances whatsoever be under any liability whatsoever to the shipper, consignee or owner of the goods or to any holder of this Bill of Lading for any loss, damage or delay of whatsoever kind arising or resulting directly or indirectly from any act, neglect or default on his part while acting in the course of or in connection with his employment and but without prejudice to the generality of the foregoing provisions in this clause, every exemption, limitation, condition and liberty herein contained and every right, exemption from liability, defense and immunity of whatsoever nature applicable to the carrier or to which the carrier is entitled hereunder shall also be available and shall extend to protect every such servant or agent of the carrier acting as aforesaid and for the purpose of all of the foregoing provisions of this clause the carrier is or shall be deemed to be acting as agent of trustee on behalf of and for the benefit of all persons who are or might be his servants or agents from time to time (including independent contractors as aforesaid) and all such persons shall to this extent be or be deemed to be parties to the contract in or evidence by this Bill of Lading.

5. Howlett introduced as its Exh. 13 a copy of a rate sheet, effective August 1, 1976, which it sent to SCI's New York agent, Norton, Lilly & Co. See Tr. 122–24. The back of the rate sheet contains "other terms and conditions." Among them are the following:

3) *Limits of Liability*

Howlett will not be responsible for any damage, regardless of cause and regardless of whether or not due to Howlett's negligence, to yachts or boats of any kind, unless they are properly crated.

On all other uncrated pieces (except yachts or boats mentioned above), Howlett shall not be responsible for any damage to the piece itself caused by Howlett's negligence or otherwise in excess of $5,000.00 per piece, including the container, if any.

On all suitably protected or crated pieces, Howlett shall not be responsible for any damage to the piece itself caused by Howlett's negligence or otherwise in excess of $10,-000.00 per piece including the container, if any.

If prior written notice is given to Howlett that a piece is to be lifted is valued in excess of $10,000.00 including the container, if any, special arrangements can be made to extend this limitation at an additional charge.

To enable it to introduce Exh. 13, Howlett called Martin Filon to the stand. Filon was Howlett's office and operations manager at the time of the accident, a position he had held for more than ten years. Tr. 115. He testified that he sent Howlett's rate sheet, its Exh. 13, to Norton, Lilly & Co., SCI's agent, a practice he had followed for ten years. Tr. 122–23.

the Howlett crane when the yacht was damaged. While operating the crane he sat about fifty to sixty feet above water and twenty feet above the deck of the M.V. VISHVA SHOBHA. The floating crane he was operating was secured to the vessel by means of lines. The stern breast line, which was five inches in diameter, attached the crane tightly to the vessel. A half-inch cable ran from the crane to the bow of the vessel. A three-quarter inch cable connected the crane to the stern and the bow of the vessel: these lines enabled the crane to move back and forth along the vessel. Selby Dep. 32–33; Tr. 138–39.

On August 9, Selby discharged twenty or more yachts from the M.V. VISHVA SHOBHA. The discharging procedure required him to position the crane's boom and gear over the yacht indicated by the Pittston signalman. The Pittston stevedoring crew would then attach slings underneath the yacht. The signalman would indicate to Selby when to lift. Selby would hoist the yacht slowly until it was a foot or less off the deck. If the signalman determined that the yacht was properly slung, he would signal to Selby to continue to lift. When the yacht had been lifted clear of the other yachts and other objects on the deck, the signalman would signal to Selby to complete the lift, swing the yacht across the vessel, and lower it into the water. Selby Dep. 5, 7, 21; Tr. 147–48. Selby would lower the yacht into "free water" outboard of the crane's breast line. Tr. 142.

In regard to the yacht in question, Selby testified that he was completing the swing across the vessel when "the stern sling . . . slid forward on the bottom of the hull up towards the bow of the boat and the boat tipped up and shot right straight down into the water, approximately 35 f[ee]t . . . right into the water and never touched anything, never touched the line on the crane or nothing." Tr. 137; see id. 145; Selby Dep. 8, 30–31, 34. Lines were attached to the yacht, and it was pulled to the crane and then, because it was taking water, lifted back onto the deck of the M.V. VISHVA SHOBA. Tr. 161.

Selby testified that safety lines are used when yachts are discharged. Selby Dep. 8. The safety lines run from the bow or stern of the yacht to the bow or stern sling, respectively. Safety lines were not used in the discharge of the yacht in question, id. 8–9; nor on the seven or eight yachts previously discharged. Id. 31; Tr. 148, 151. Subsequent to the accident, however, safety lines were used for the discharge of the remaining yachts. Selby Dep. 32; Tr. 161–62.

Selby also testified that he took control of the lift when he was given the signal to "boom up and discharge" the yacht. Tr. 147. If he saw anything that was wrong with the lift, he would stop the lift completely. Tr. 148. He testified that he complained about the absence of safety lines, probably between the first and second lifts, Tr. 151, but he did not know to whom he complained, Tr. 150—someone on the deck of the vessel, Tr. 149. He continued to discharge the yachts without the use of safety lines. Tr. 151. He testified that the absence of safety lines was important enough to state in an accident report after the yacht was damaged, but he did not recall whether he indicated that absence when he gave his report to a surveyor. Tr. 149. The surveyor's report does not refer to any complaint by Selby to Pittston about the non-use of safety lines in the discharge of the yacht. Tr. 150.

Miller Yacht Sales introduced as Exh. 13 the deposition of William Langan, taken March 14, 1979 ("Langan Dep."). On August 9, 1976, Langan was in charge of the Pittston stevedoring crew unloading the M.V. VISHVA SHOBHA. Id. at 5. He described the discharge of the yachts in detail. Id. at 12–13, 15. He testified that the crew placed safety lines on the yacht in question, id. at 15–16, 28, just as he said they did on every yacht discharged. Id. at 28. When the yacht was lifted and swung across the vessel's deck, Langan followed it across the deck so that he could watch it being lowered into the water. Id. at 16. While the crane was lowering the yacht, "the breast line touched underneath the

roof of the boat, the bow of the boat dipped, slipped out of the slings that were carrying it out and dropped into the water." *Id.* at 5. The roof "wasn't hung" up on the line; "it just hit it." *Id.* at 19. The line and the yacht were in contact for a split second. *Id.* The yacht fell ten to fifteen feet into the water. *Id.* at 27. The damaged yacht was then secured to the crane barge. He testified that he did not know what was done with the yacht after that. *Id.* at 31, 36. Langan went within ten minutes to report the accident to his supervisors. He reported that the roof of the yacht had touched the line. *Id.* at 22–23.

Plaintiff Miller Yacht Sales introduced as its Exh. 14 the deposition of Saverio J. Galati, taken December 15, 1978 ("Galati Dep."). On August 9, 1976, he was Pittston's terminal manager at the pier where the M.V. VISHVA SHOBHA was being unloaded. He testified that Pittston supplied the men and gear, including the slings and spreader bars, for the discharge of the yachts. He had no direct knowledge of the accident. He stated that Langan told him that he, Langan, had observed the accident. *Id.* at 11, 20. A report Galati made after the accident indicated that none of Pittston's crew claimed to have seen the accident, *id.* at 15–16, but Galati explained that he had not been including Langan in that statement. *Id.* at 16.

Pittston called Paul Keeler to the stand to testify as an expert witness on its behalf. Keeler testified that he had 47 years of experience in maritime and longshoring businesses. He also testified that he had experience as a yachtsman and in the yachting business, as well as specific experiences operating floating cranes and supervising their discharge of motor yachts from ocean-going vessels. Tr. 36–40.

After describing the proper discharge of yachts, Keeler gave his opinion as to the cause of the accident. He testified that the yacht must have been slung well for it to have been hoisted, moved across the deck of the vessel, and stopped, the last of which always involves a jiggle. The yacht fell out of its slings while being lowered. The aft sling shot forward. For that to occur, something would have to relieve the five tons on the rear sling—in the absence of wind, crane malfunction or "cowboying" by the crane operators. Tr. 48–49. The testimony of the stevedore (Langan) indicates, Keeler continued; that the crane operator lowered the cabin overhang of the yacht onto the breast line, which could have relieved the pressure on the sling. When the crane operator saw what he was doing, he lifted or swung the yacht to free it from the line. Tr. 50–52.

Keeler testified that the damage to the yacht, as indicated in the pictures marked as Pl.'s Exhs. 8A–8E, was consistent with his description of the accident. Tr. 52. Exhs. 8B and 8E show the damage to the transom. They indicate that the falling yacht struck the transom at a steep angle—where the hull planking met the transom planking. No part of either the fore or aft cabin tops struck water. Tr. 53–55.

Exh. 8D, he continued, shows the damage to the cabin. The cabin had been lifted completely off its supports, which had been glued and fastened by tenon and mortise to the fore and aft timbers of the cabin. The cabin had been lifted completely off the tenon notch; the mortise and tenon did not rejoin when the cabin hit the water. Tr. 55.

Exh. 8C shows that the cabin had been lifted off the deck. Because the tenon and mortise did not rejoin, a space remained between the overhead and the cabin. Tr. 55–56. Exh. 8A shows damage caused by the cabin's being lifted clear of its fastening on the yacht's deck and side. Tr. 56. The above-described damage occurred not when the yacht struck the water, but rather when the yacht struck the breast line. Tr. 58.

Keeler testified that safety lines would not have prevented the accident. Tr. 59, 60, 62. The safety lines are like clothes lines; their purpose is just to hold the sling in place. Once the yacht was out of the slings, safety lines would not have prevented the boat from falling. Tr. 60. The safety lines would hold only the top of the sling in position because the line cannot be tied low on the sling. If the pressure on the aft

sling were relieved, the bottom of the sling would move forward, putting too much weight in the back to keep the yacht horizontal once the pressure were restored. Tr. 60–61. Keeler did state, however, that the safety lines would prevent the sling from "travel[ing] too far." Tr. 61.

As to the height of the yacht's fall, he testified that the damage to the transom indicates that "the yacht didn't fall from anything like 30 feet." Tr. 62. Had it done so, the transom would have been smashed. More indicative of a shorter fall was the presence, after the fall, of only two feet of water in the hull of the yacht. *Id.* The beginning of the fall was closer to 10 to 15 feet from the water, a height near where the breast line ran. Tr. 63.

In assessing responsibility for discharging the yachts, Keeler testified that the stevedore's duty was to sling a lift properly. The crane operator's duty was to refuse to pick up an improperly slung lift. Once the stevedore gives the signal to lift the cargo over the side, the duty is completely the crane operator's. Tr. 74–76.

On cross-examination, Keeler testified that the sling on the yacht could not have simply shot forward after the yacht had been lifted, traversed, and stopped. Tr. 93. Regarding his prior testimony to the effect that a substantial force would be required to relieve the weight on the sling, he testified that hitting a line for a split second is a substantial force. Tr. 110–12. Finally, he stated that the roof could not have become dislodged by the force of hitting the water. Tr. 112–13.

The parties also submitted statements of other workers regarding the accident. The Court finds it unnecessary to set out those statements here. The Court has also examined the damage surveys introduced at trial, but need not discuss them here.

### Discussion

Miller Yacht Sales' yacht was dropped into the water and damaged. This fact is undisputed. The main disputes in this action involve the cause of the yacht's fall and the extent of liability among the defendants.

### Liability

■ The Court finds that the yacht fell while the crane operator was lowering it into the water. The operator allowed the cabin of the yacht to hit a breast line mooring the crane to the M.V. VISHVA SHO-BHA. When the yacht caught the breast line, the pressure was relieved on the aft sling, enabling it to move forward. The sling was allowed to swing forward a greater distance than possible had it been secured with a safety line tied to the stern of the yacht. When the yacht was freed from the breast line, it fell stern first because the aft sling was no longer in a position to support it. The yacht fell from a height less than 30 feet—probably from a height of 10 to 15 feet. The damage to the yacht's rear cabin was caused by the yacht's contact with the breast line, not by hitting the water.

The central dispute on liability is whether the yacht fell because the aft sling "shot forward" in the absence of safety lines or whether it fell because the yacht was hung on the breast line, allowing the aft sling to "shoot forward." As indicated above, the Court finds that the weight of the credible evidence supports findings that the sling was allowed to move forward because Howlett's crane operator caught the breast line with the yacht and because Pittston's stevedoring crew had neglected to secure the sling in position with safety lines. The Court bases its finding that the yacht came into contact with the breast line largely on the following factors.

First, the sling would not, in any reasonable likelihood, simply have shot forward, as Selby stated, Selby Dep. at 30–31, given: the distance the yacht had already been transported in the slings and the motions the yacht had survived during the initial lift and the beginning and halting of the traverse; the absence of any crane malfunction or other force to relieve the pressure on the sling; and the amount of the pressure on the aft sling, approximately five tons. *See* Tr. 48–49 (Testimony of Keeler).

Secondly, the Court agrees with Keeler that the damage to the yacht, see Pl.'s Exhs. 8A–8E, indicates that the breast line caught the yacht while it was being lowered. The record provides no credible evidence to indicate that the extensive damage to the cabin—particularly its separation from its supports despite glued and mortised and tenoned joints—could have occurred when the hull and transom planking struck the water. Keeler also testified that the damage to the yacht indicates that it fell from 10 to 15 feet, in the area of the breast line, rather than 30 to 35 feet, the yacht's high point. Had the yacht fallen from 30 to 35 feet, he testified, the damage to the transom would have been much greater. Tr. 62. Thirdly, Langan testified at his deposition that the cabin roof hit the breast line. Langan Dep. at 5, 19. The Court questions Langan's memory of the events of that day generally, but finds that Langan's explanation of the contact between the breast line and yacht credible in view of the other evidence given above.

At his deposition, Langan testified that the Pittston crew had placed safety lines on the yacht. Langan Dep. at 15–16, 28. The record establishes, however, and no party contends otherwise, that safety lines were not used on the yacht. The question is whether the absence of safety lines had an effect on the accident. Pittston's expert, Keeler, testified that safety lines would not have prevented the accident. Tr. 59, 60, 62. He explained that the safety lines would prevent only the top of the sling from moving. The movement of the bottom of the sling would be enough to unbalance the yacht, causing it to fall. Tr. 60–61. He conceded, though, that the safety line would prevent the sling from "travel[ing] too far." Tr. 61. The Court agrees that safety lines would not have allowed the aft sling to move far from its proper position. If, for example, the safety lines were tied even in the approximate place in which they are tied in the first page of photographs in Pl.'s Exh. 11 (Loss Survey Report of Hull and Cargo Surveyors, Inc.), the movement of the bottom of the sling would be minimal compared to the movement of the sling

without safety lines. That safety lines are not strong is not pertinent; they need only have held the sling in position, not supported the weight of the vessel. The added safety that could have been given with the minimal precaution of safety lines would likely have prevented the yacht from falling into the water. The Court of course cannot know to a certainty whether the yacht would have fallen even with safety lines, but it finds that it is more likely than not that the yacht would not have fallen if that precaution had been taken. Even with safety lines securing the slings, however, the cabin damage would have occurred when the cabin caught the breast line.

■ As the foregoing discussion indicates, the Court finds no active fault on the part of SCI. Before discussing SCI's liability, it is appropriate to assess relative degrees of fault between Howlett and Pittston. Such a determination has been possible since 1975 when the Supreme Court, in *United States v. Reliable Transfer Co.*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975), abrogated the old admiralty rule of divided damages. The old rule "require[d] the equal division of property damage whenever both parties are found to be guilty of contributing fault, whatever the relative degree of their fault may have been." *Id.* 421 U.S. at 397, 95 S.Ct. at 1709. Under the new rule, liability is to be assessed proportionately according to the parties' relative degrees of fault. *Id.* 421 U.S. at 411, 95 S.Ct. at 1715. Such an assessment is neither an easy task, *Moran Towing & Transp. Co. v. City of New York*, 620 F.2d 356 (2d Cir. 1980), nor an exact procedure, *Alva Steamship Co. v. City of New York*, 616 F.2d 605, 610 (2d Cir. 1980). Based on the findings stated above and the damage surveys introduced at trial, the Court concludes that Howlett was 70% at fault and that Pittston was 30% at fault.

■ SCI, as the carrier, is liable for the damages to the yacht for failing to fulfill its duty to effect proper discharge. It is liable through the negligence of Howlett and Pittston, independent contractors SCI

engaged, because the duty to effect proper discharge is nondelegable. 2A *Benedict on Admiralty* § 113, at 11–7 (7th ed. 1977); *see Alva Steamship Co. v. City of New York, supra*, 616 F.2d at 610. Howlett and Pittston remain liable for their own negligence, however. *Id.* Accordingly, neither can recover from SCI. SCI is entitled to indemnification from them, however, because they breached their duties of workmanlike service. *See Fernandez v. Chios Shipping Co.*, 542 F.2d 145, 149 (2d Cir. 1976); *Demsey & Assoc. v. S.S. Sea Star*, 461 F.2d 1009, 1017 (2d Cir. 1972). Allowing indemnification to SCI is appropriate because it places liability on the party best able to adopt measures to prevent the recurrence of such accidents. *See Fernandez v. Chios Shipping Co., supra*, 542 F.2d at 150–51.

█ SCI also seeks disbursements and attorneys' fees. Although Howlett correctly contends that attorneys' fees are not ordinarily recoverable absent statutory or contractual authority, they are awarded in indemnification cases to the extent of the fees expended in defending against the original suit. *David Crystal, Inc. v. Cunard Steam-Ship Co.*, 339 F.2d 295, 300 (2d Cir. 1964), *cert. denied*, 380 U.S. 976, 85 S.Ct. 1339, 14 L.Ed.2d 271 (1965); *Herman C. Starck, Inc. v. Finn Lines*, slip op. at 12, 75 Civ. 3613 (WK) (S.D.N.Y. Apr. 3, 1978) (Memorandum & Order). SCI is entitled to disbursements and attorneys' fees expended in defending against Miller Yacht Sales' suit. Howlett and Pittston must indemnify SCI according to their relative degrees of fault (70%/30%).

*Limitation of Liability*

█ The United States Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. §§ 1300 et seq., is the most important body of law governing the shipping of cargo to and from United States ports. It is inapplicable here, however, because the carriage of the yacht did not come within its terms. Section 1301 excludes from the term "goods," within the meaning of the Act, "cargo which by the contract of carriage is stated as being carried on deck and is so carried."

The Bill of Lading, Pl.'s Exh. 1A, states on its face: "ON DECK AT SHIPPER'S RISK." The record establishes that the yacht was carried on deck.

COGSA supplanted in large part the provisions of the Harter Act, *see generally* Gilmore & Black, *The Law of Admiralty* § 3–24, at 144 (1975), but the Harter Act remains the law for some carriages. Because the Harter Act and COGSA are so alike on most points, cases under one are cited as authority under the other. Gilmore and Black, *supra* § 3–25, at 148. It is not immediately clear, however, that the Harter Act could apply to the carriage here. COGSA expressly saves the Harter Act from repeal "insofar as [it] relate[s] to the duties, responsibilities, and liabilities of the ship or carrier prior to the time when the goods are loaded on or after the time they are discharged from the ship." 46 U.S.C. § 1311. The question becomes whether the Harter Act was saved from repeal *during* discharge where COGSA does not apply because the cargo was carried on deck pursuant to an "on deck" provision in the Bill of Lading.

SCI and Howlett argue for the application of the Indian COGSA, which, like the United States COGSA, adopted language from the Hague Rules. Miller Yacht Sales responds that this argument is "totally without merit," Reply Memorandum at 5, because the Indian COGSA art. 1(c) specifically excludes, like its American counterpart, "on deck cargo" from the meaning of "goods" within the act. The Court concludes, however, that the Bill of Lading sufficiently incorporates the Indian COGSA so that its provisions, minus the "on deck" provision, apply to the carriage of the yacht by the M.V. VISHVA SHOBHA. The Bill of Lading ¶ 27, quoted in n. 1 *supra*, provides that the Bill of Lading shall be governed by the laws of India, and the "clause paramount," also quoted in n. 1 *supra*, specifically makes the Indian COGSA applicable. The "clause paramount" also provides that "[i]f anything herein contained be inconsistent with the said provisions it shall to the extent of such inconsistency and no further be null and void." These clauses

incorporate the provisions of the act into the Bill of Lading. *See, e. g., Pannell v. United States Lines Co.,* 263 F.2d 497, 498 (2d Cir.), *cert. denied,* 359 U.S. 1013, 79 S.Ct. 1151, 3 L.Ed.2d 1037 (1959); *Waterman S.S. Corp. v. United States Smelting, Refining & Mining Co.,* 155 F.2d 687, 691 (2d Cir.), *cert. denied,* 329 U.S. 761, 67 S.Ct. 115, 91 L.Ed. 656 (1946).[6]

■ Defendants seek to limit their liability under Indian COGSA art. IV(5), quoted in n. 2 *supra,* and Bill of Lading ¶ 19, quoted in n. 3 *supra.* Both provided for a limitation amount of 100£ sterling unless the shipper declared the nature of the goods and a higher value and that declaration was inserted in the Bill of Lading. The shipper did not do so in this case. Paragraph 19 put it on notice that it could do so if it paid the extra freight, if required. The amount of limitation under paragraph 19 is on its face valid under Indian COGSA art. IV(5): the limitation amounts are the same. In addition, the yacht constituted one unit or package. Bill of Lading (No. of Packages: 1 Unit); SCI Freight Tariff No. 1; SCI Exh. 5; under United States COGSA, *see, e. g., Aluminos Pozuelo Ltd. v. S.S. Navigator,* 407 F.2d 152 (2d Cir. 1968); *Island Yachts, Inc. v. Federal Pacific Lakes Line,* 345 F.Supp. 889 (N.D.Ill.1971). Accordingly, SCI's liability is limited to 100£ sterling.

■ The question remains whether Howlett and Pittston may benefit from the limitation of liability to 100£ sterling. Under the United States COGSA, to which the Court looks for guidance, *see* Gilmore & Black, *supra* § 3–48, at 191, only the carrier, as a general rule, may benefit from the limitation of liability. *Robert C. Herd & Co. v. Krawill Mach. Corp.,* 359 U.S. 297, 79 S.Ct. 766, 3 L.Ed.2d 820 (1959); Gilmore & Black, *supra* § 3–25, at 149. Howlett and Pittston may benefit, however, from the limitation if the Bill of Lading extends the limitation to them. *Robert C. Herd & Co., supra,* 359 U.S. at 302, 79 S.Ct. at 769. This extension must be clearly expressed. *Id.* 359 U.S. at 305, 79 S.Ct. at 771. *Toyomen-*

*ka, Inc. v. S.S. Tosaharu Maru,* 523 F.2d 518, 520–21 (2d Cir. 1975).

■ Howlett and Pittston argue that Bill of Lading ¶ 32, quoted in n. 5 *supra,* clearly expresses the intention to extend the benefits of the limitation of liability to them. Paragraph 32 extends the benefits of the carrier to its servants or agents, "including every independent contractor from time to time employed by the carrier." It further provides that "all such persons shall to this extent be or be deemed to be parties to the contract in or evidence[d] by this Bill of Lading." This language is sufficient to extend the limitation of liability to Howlett and Pittston. *Compare Bernard Screen Printing Corp. v. Meyer Line,* 464 F.2d 934, 935–36 (2d Cir. 1972), *cert. denied,* 410 U.S. 910, 93 S.Ct. 966, 35 L.Ed.2d 272 (1973) (stevedore held to be within language "independent contractors"), and *Carle & Montanari, Inc. v. American Export Isbrandtsen Lines, Inc.,* 275 F.Supp. 76 (S.D. N.Y.), *aff'd,* 386 F.2d 839 (2d Cir. 1967), *cert. denied,* 390 U.S. 1013, 88 S.Ct. 1263, 20 L.Ed.2d 162 (1968) (stevedore entitled to limitation of liability because bill of lading specifically extended benefits to "stevedores"), *with Toyomenka, Inc., supra,* 523 F.2d at 521 ("all servants, agents and independent contractors . . . *used or employed by the Carrier"* (court of appeals' emphasis) held not to include independent contractor *of the stevedore*); *Rupp v. International Terminal Operating Co.,* 479 F.2d 674, 77 (2d Cir. 1973) ("all persons rendering services in connection with performance of this contract" held not to include the stevedore, but court of appeals distinguishes *Bernard Screen Printing Corp., supra,* because there the stevedore "could be readily characterized as an 'independent contractor' "), *and Cabot Corp. v. S. S. Mormacscan,* 441 F.2d 476 (2d Cir.), *cert. denied sub nom. John W. McGrath Corp. v. Cabot Corp.,* 404 U.S. 855, 92 S.Ct. 104, 30 L.Ed.2d 96 (1971) (same operative language as in *Rupp, supra,* and same result).

---

**6.** It appears that the Indian COGSA would not apply by its own terms also because the yacht was not carried from an Indian port. See Indian COGSA ¶ 2 (application of Rules).

Finally, Miller Yacht Sales argues on the basis of Bill of Lading ¶ 7 that none of the defendants should be entitled to limit its liability. Paragraph 7(a) purports to exclude any liability "before loading, on/or after discharge."[7] Miller Yacht Sales argues, in essence, that because this paragraph deals specifically with the time in question in this case, it—and not paragraph 19—governs, and because paragraph 7 is unenforceable, no limitation provision applies. Paragraph 7(b) provides that the carrier shall have no liability as to goods carried on deck.[8] Miller Yacht Sales reads both clauses to indicate that SCI sought to exempt itself and its agents and independent contractors from any liability.

The defendants do not rely on paragraph 7. Even if they did, the paragraph would be without effect. The Indian COGSA was incorporated in this "on deck" Bill of Lading. Accordingly, the provision in the act that excludes "on deck" cargo, art. 1(c), does not apply in this Bill of Lading by the force of the incorporation itself. Because the provisions of the act were incorporated, article IV(5) and its counterpart in the Bill of Lading, paragraph 19, do apply. The incorporation also makes Indian COGSA art. III(2) & (8) effective as provisions in the Bill of Lading. Article III(2) requires, *inter alia*, the carrier to discharge the goods properly and carefully. Article III(8) provides:

Any clause, covenant or agreement in a contract of carriage relieving the carrier or the ship from liability for loss or damage to or in connection with goods arising from the negligence, fault or failure in the duties and obligations provided in this Article or lessening such liability otherwise than as provided in those Rules, shall be null and void and of no effect.

These articles, read together, indicate that the defendants could not escape liability during discharge. The precedence of the Indian COGSA provisions, as incorporated in the Bill of Lading, over other Bill of Lading provisions, is reinforced by the "clause paramount," which provides that "[i]f anything herein contained be inconsistent with the [Indian COGSA] provisions it shall to the extent of such inconsistency and no further be null and void." A separate argument that Miller Yacht Sales proffers regarding paragraph 7, that the Bill of Lading did not govern at the time of the accident, is without merit.

### Conclusion

SCI, Howlett, and Pittston are all liable to Miller Yacht Sales for the damage to the yacht. Howlett and Pittston are primarily liable, Howlett for 70% of the damages and Pittston for 30% of the damages. SCI is entitled to indemnification from Howlett and Pittston according to those percent-

7. Paragraph 7(a) provides:
BEFORE LOADING AND AFTER DISCHARGE:
Neither the Carrier, its Agents, Servants nor the Ship shall be liable for any loss, damage or detention whatsoever of or to the goods before loading, on/or after discharge from the ship named herein or substituted therefor under the provisions hereof, even though such loss, damage or detention be caused by the act, neglect or default of the Carrier, its Agents or Servants or other persons for whom the Carrier is responsible or by the unseaworthiness or unfitness of any craft, vessel or conveyance at the time the goods are placed therein or at any time thereafter even though the goods are in the custody of the Carrier, its Agents or Servants as warehouseman or otherwise howsoever, and the goods prior to loading or subsequent to discharge over the rail of the vessel are at the sole risk of the owners of the goods.

8. Paragraph 7(b) provides:
GOODS CARRIED ON DECK AND CARRIAGE OF ANIMALS:
Goods carried on deck and stated herein to be so carried and live animals wherever carried or received and carried solely at the shipper's risk and the carrier shall not be liable for any loss, detention, damage or injury thereof or thereto arising or resulting from any cause whatsoever even though such loss, detention, damage or injury be caused by the negligence of the carrier, its agents or servants or other persons for whom the carrier is responsible for the unseaworthiness or unfitness of any craft, vessel or conveyance at the time of placing therein or at any time thereafter. Except as provided such shipment shall be deemed goods and shall be subject to the terms and conditions in this bill of lading relating to goods.

ages, for costs, including attorneys' fees, or defending against Miller Yacht Sales' claim against it. The defendants should stipulate to such costs and attorneys' fees.

SCI, Howlett, and Pittston are all entitled to the limitation of liability provisions in the Indian COGSA and the Bill of Lading. The damages to Miller Yacht Sales are therefore limited to 100£ sterling. The defendants are to pay according to the formula given in the preceding paragraph.

Defendant Howlett is directed to submit judgment on notice.

So ordered.