**John F. JURGENS, Gail Jurgens, Bridget Jurgens and Kate Jurgens, Plaintiffs,**

v.

**POLING TRANSPORTATION CORPORATION, Chester A. Poling, Inc., Mabel L. Poling Corp., Motor Vessel Poling Bros. 9, Inc., Metro Fuel Oil Corporation, Metro Terminals Corp., Ultimate Transport Inc., Janet Mahland, the Anthony J., the Clara P. and the Jeanne C., their tackle, engines and appurtenances, etc. in Rem, Defendants.**

**Philip Becker and Patricia Becker, Plaintiffs,**

v.

**Poling Transportation Corporation, Chester A. Poling, Inc., Mabel L. Poling Corp., Motor Vessel Poling Bros. 9, Inc., Metro Fuel Oil Corporation, Metro Terminals Corp., Ultimate Transport Inc., Janet Mahland, the Anthony J., the Clara P. and the Jeanne C., their tackle, engines and appurtenances, etc. in Rem, Defendants.**

**Nos. 96 CV 1265, 96 CV 1768.**

United States District Court,
E.D. New York.

Sept. 19, 2000.

Bantle & Levy LLP (Lee F. Bantle, of counsel), New York City, for plaintiffs John, Gail, Bridget, and Kate Jurgens.

Cappiello, Hoffman & Katz, P.C. (Paul T. Hoffman, of counsel), New York City, for plaintiffs Philip and Patricia Becker.

Freehill, Hogan & Mahar (John J. Walsh, of counsel), New York City, for defendants Poling Transportation Corporation, Chester A. Poling, Inc., Motor Vessel Poling Bros. No. 9, Inc., Janet Mahland, and Mabel L. Poling Corp.

Jacobowitz, Garfinkel & Lesman (Frank A. Lisi, of counsel), New York City, for defendant Metro Fuel Oil Corporation.

Callan, Regenstreich, Koster & Brady (Joseph H. Herbert, III, of counsel), New York City, for defendant Ultimate Transport. Inc.

## MEMORANDUM AND ORDER

NICKERSON, District Judge.

Plaintiffs John F. Jurgens and Philip Becker, seamen employed on the ANTHONY J, a commercial vessel, brought these consolidated actions against the named defendants under the admiralty law as modified by the Jones Act, 46 U.S.C.App. § 688, the general maritime law, 28 U.S.C. § 1333, and the common law of negligence, seeking recovery for injuries they sustained from a fire while transferring gasoline from a barge called THE CLARA P. into a fuel truck.

The only defendants now remaining before the court are Janet P. Mahland, Metro Fuel Oil Corp., and Metro Terminals Corp. The other defendants are no longer parties before the court.

Plaintiffs have moved for partial summary judgment against defendant Janet P. Mahland, and she has cross-moved for summary judgment dismissing the complaints as to her. Defendants Metro Fuel Oil Corp. and Metro Terminals Corp. have also moved for summary judgment dismissing the complaints as to them.

## I. BACKGROUND

*Procedural Background*

Plaintiffs Jurgens and Becker were seaman working on the coastal tanker called THE ANTHONY J. Jurgens as captain and Becker as chief engineer. The record contains conflicting evidence as to whether plaintiffs were employed by defendant Poling Transportation Corporation or defendant Chester A. Poling, Inc.

Defendant Chester A. Poling, Inc. (Chester A. Poling) is the parent corporation of Poling Transportation Corporation (Poling Transportation). Poling Transportation, in turn, is the corporate parent of several corporations that own or owned one or more vessels in navigation, among them the defendant Motor Vessel Poling Bros. No. 9, which owned a barge called THE CLARA P. Another Poling Transportation subsidiary owned THE ANTHONY J.

Janet Mahland was in August 1995 a director and president of Poling Transportation and Motor Vessel Poling Bros. No. 9, and president of Chester A. Poling. The court entered a default judgment against all three corporations.

Defendants Metro Fuel Oil Corporation (Metro Fuel) and Metro Terminals Corp. (Metro Terminals) collectively "Metro," are companies based in Brooklyn, New York, in the business of buying, selling and distributing petroleum products. Metro Fuel is a marketing entity that buys and sells petroleum products using terminal facilities owned by Metro Terminals. Metro Terminals is also licensed to buy and sell gasoline. Joseph Squadrito was a purchase and sales manager for Metro Fuel, and also handled purchases made by Metro Terminals.

Defendant Ultimate Transport Inc. ("Ultimate") owned and operated a small fleet of trucks for transporting fuel oil and other products.

The Court entered default judgment against Ultimate on March 10, 1997. Ulti-mate and plaintiffs entered into a settlement agreement on April 14, 2000.

*The Proposed Sale of THE CLARA P.*

In August 1995 THE CLARA P. was moored at a dock operated by Poling Transportation in Staten Island, New York. A person the parties knew only as "Marcos," an agent for a buyer named Abdullah Abdullah, approached Mahland in 1995 with an offer to buy THE CLARA P. Upon inspection, Marcos discovered that THE CLARA P.'s "slop" tanks contained a substance that smelled of gasoline.

This substance, referred to by the parties as "product," included water mixed with gasoline or some other hydrocarbon fluid. The parties disagree as to its precise composition.

On behalf of Abdullah, Marcos agreed to buy THE CLARA P. provided that the tank containing the product and the other storage compartments were cleaned. Mahland negotiated the agreement. It is unclear whether she did so as president of Poling Transportation or of Motor Vessel Poling Bros.

On August 17, 1995, Mahland told Frederick Carmant, a dispatcher for Poling Transportation, to arrange for THE CLARA P.'s slop tanks to be cleaned out. She and Carmant were both aware that THE CLARA P.'s onboard pumping system was inoperative.

*Discussions with Metro Fuel*

At Mahland's suggestion, Carmant called several companies who provide pumping services in the harbor. When he told Mahland that none of the companies was available, Mahland told him to call Metro Fuel. She did not give specific instructions on how the boat was to be cleaned.

Carmant stated that Metro had often bought gasoline or fuel oil from Poling Transportation, and that a boat in Poling Transportation's fleet would typically transport the product to Metro Terminals

where it would be offloaded. THE CLARA P. could not do this job because its internal pumps were inoperative and, apparently, it was not then authorized to travel upon navigable waters.

Carmant then called Joseph Squadrito, Metro's purchase and sales manager. Carmant claimed that he offered to give Metro the product on the Clara P. without charge if Metro would arrange have it offloaded from the barge and transported to Metro Terminal. Squadrito said Carmant offered to sell him gasoline, without mentioning that Metro Fuel needed to arrange for its transportation.

Squadrito came to the Poling Transportation yard on the morning of August 18, 1995 to obtain a sample of the product from THE CLARA P. Carmant, Mahland and Squadrito gave different versions of Squadrito's visit and of subsequent events.

In a deposition Squadrito testified in substance as follows. When he visited the Poling yard, Carmant told him that the product would have to be pumped off of the barge onto a truck prior to any delivery. Squadrito told Carmant that Metro Terminal could not receive fuel unless it was delivered by barge, and so probably could not accept the product. Carmant then asked Squadrito to recommend a company that could offload and transport the product to another location within the Poling Transportation yard. Squadrito said he suggested Ultimate Transportation and two other trucking companies.

Carmant's testimony was that Squadrito obtained a sample of the product and said he would have it tested and tell Carmant later that day whether Metro Fuel would accept it. Squadrito then left Poling's yard without discussing Ultimate.

Carmant said Squadrito called him early the same afternoon and said the product had been tested and found to be clean gasoline. Squadrito allegedly said also that Metro would accept the product. Carmant said he then told Squadrito that the product would have to be pumped off

THE CLARA P. and then transported to Metro Terminal. It was Carmant's understanding that Metro Fuel would accept delivery at Metro Terminal, and would pay for the transportation.

Carmant also said he asked Squadrito how Poling should transport the product. Carmant said he told Squadrito that a "vacuum truck" was needed for the job.

Carmant gave conflicting testimony as to whether Squadrito instructed him to call Ultimate or simply recommended Ultimate as a potential transport company. Carmant said Squadrito characterized Ultimate as "our trucking company" or a company that Metro "had used ... before and were satisfied with."

Mahland was sitting next to Carmant when Squadrito called on the afternoon of August 18, 1995. Carmant said he told Mahland that Metro could accept the product via truck, and that Squadrito recommended Ultimate. Mahland corroborated this statement.

Jurgens was also present when Carmant spoke to Squadrito on the phone. He said it was his understanding that Metro agreed to accept the product and that "they would take it off that night." Specifically, he believed that Metro would supply a truck to offload and transport the product.

Squadrito admitted that he called Carmant, but said he did so only to confirm that Metro Fuel would not accept the product. Squadrito admitted knowing that Ultimate did not have vacuum trucks.

On the morning of August 18, Carmant told Jurgens to pump water from a different tank on THE CLARA P., using a portable hand pump stored on the Poling yard. He later told Jurgens to have the crew of THE ANTHONY J. help remove the product from the slop tanks, and said a vacuum truck would arrive later that day.

*Discussions with Ultimate*

Carmant said that after the phone call with Squadrito, he called Ultimate and

spoke to a secretary named Tina Henson. Carmant said he told Henson that Squadrito had recommended Ultimate, and asked whether Ultimate could provide a vacuum truck to remove gasoline from a barge and transport it to Metro Terminal.

Carmant said Henson told him a truck would come to the Poling Transportation yard later that afternoon. Carmant said he assumed that Metro Fuel would pay for the truck, and that he never discussed payment with anyone at Ultimate.

Yuri Schemelzman, the owner of Ultimate, gave a different version of the sequence of events. He said the first call to Ultimate regarding the transaction was not from Carmant but from Squadrito to Henson. Squadrito allegedly asked if Ultimate could help Poling Transportation and asked Henson to contact Carmant directly. Henson then spoke to Carmant, arranged for Poling to "lease" a truck for the afternoon, and negotiated a price, according to Schemelzman.

Schemelzman said he understood that Metro Fuel needed the truck to pump an unidentified substance from a boat into the truck and transport it to barrels to be stored on the Poling yard. But later in his deposition, Schemelzman said he thought that the product was to be transported to Metro Terminal.

It is undisputed that Ultimate did not have vacuum trucks, and that Squadrito knew this before recommending Ultimate to Carmant. Squadrito maintains that he did not know a vacuum truck was needed, although he admits knowing that fuel of some sort was to be pumped from THE CLARA P.

Ultimate eventually dispatched a regular tanker truck, not a vacuum truck. The truck was driven by Etvern O. Nugent, an Ultimate employee. Nugent was accompanied by Calver Leslie, whom he characterized as a visiting friend rather than an Ultimate employee. Jurgens and Becker testified that Leslie appeared to be Nugent's assistant and helped in the pumping operation.

Nugent said that Ultimate's dispatcher gave him the following instructions. He was to drive first to a storage facility in Brooklyn to pick up a piece of equipment called a coupler, which is typically used to link two lengths of hose. Nugent was then instructed to drive to the Poling yard, where he would pick up "something" and take it to Metro Terminal. While at Poling, Nugent was to follow instructions from Poling's employees.

*The Fire*

Nugent arrived at Poling's yard at approximately 4:00 p.m. on August 18, 1995. Mahland left the Poling yard just as Nugent was arriving.

Jurgens said that when he discovered that Ultimate had not sent a vacuum truck, he discussed with Becker, Nugent and Leslie how they should to remove the product from the boat. He said that together the men decided to use the portable pump Jurgens and Becker had used earlier to remove water from a different tank on THE CLARA P.

Nugent testified that he played no part in this decision and, per his instructions from Ultimate's dispatcher, he merely did what Poling's employees told him to do.

George Reid, a master mariner retained by Jurgens as an expert, stated in an affidavit that the pump used by plaintiffs was not designed to pump combustible products, and that such a use of the pump posed a significant risk of fire or explosion.

Jurgens said that he, Becker, Leslie and another Poling employee set up the pump using the coupler that Nugent had picked up. The pump sat on the deck of THE CLARA P., which was moored to a small tugboat. The tugboat, in turn, was moored to the dock. The men ran an intake hose from the pump through a cargo hatch into THE CLARA P.'s slop tank, and ran an output hose from the pump across the deck of the tugboat and to the

truck. Such an arrangement is known as an "over-the-top transfer."

Jurgens started the pump and began filling the first of two compartments on the Ultimate truck. When Nugent signaled Jurgens that the compartment was full, Jurgens shut the pump off and transferred the hose to the truck's other compartment.

When Jurgens restarted the pump, an explosion occurred onboard THE CLARA P. The cause of the explosion has not been definitively identified, but the parties agree it was related to the pumping operation.

The fire quickly engulfed Jurgens and Becker, both of whom jumped into the water. Both men suffered burns over much of their bodies. They were taken by ambulance to Cornell University Medical Center where both remained in intensive care for more than two weeks.

As soon as he saw the fire, Nugent disconnected the hose from the pump and drove the truck from the Poling yard. Nugent and Shemelzman say that Nugent then drove the truck to Metro, where Metro employees directed him to unload the product from THE CLARA P. using pumping equipment at the terminal.

Squadrito denied that the product was delivered to Metro. He and Thomas Torre, Vice President and Treasurer of Metro Fuel, testified that Metro Terminal did not have equipment to receive fuel deliveries by truck.

At some point after the explosion, the output hose was pulled out of THE CLARA P.'s tank, causing an undetermined amount of oil to spill into the water.

The record includes no written records of arrangements or transactions between any of the Poling parties, Ultimate, or the Metro defendants.

*Cover–Up*

Carmant said that after the fire, he and Mahland "agreed that damage control had to be done, and we agreed to attempt to protect the customer, who was Metro, . . . and protect the company, which was Poling Transportation."

Specifically, they agreed "to concoct a story" to tell any law enforcement officials who investigated the accident. They agreed to tell investigators that Poling had planned to offload the product from THE CLARA P. and store it in barrels at the Poling yard rather than give it to Metro Fuels, and that they hired Ultimate to help in this operation.

Carmant said he and Mahland were concerned that law enforcement officials would view the transfer of product to Metro Fuels as a black market gasoline sale. They also wished to protect Metro, a longstanding Poling customer, from any potential civil liability.

Carmant said he spoke to Squadrito twice after the fire, once on the telephone and once at Carmant's house. Carmant said he conveyed to Squadrito Poling's plan to "keep[ ] Metro completely out of it." Squadrito listened but was "very noncommittal" and refused to comment, according to Carmant.

Squadrito admits that he spoke with Carmant and visited his house to discuss the fire, but denies hearing about a cover-up.

Carmant also said that he relayed the plan to the secretary at Ultimate. Carmant told her to tell investigators that Ultimate had supplied Poling with a vacuum truck to move the product from the barge into barrels on the shipyard. The secretary told him that Ultimate "would have a problem with that story because [they] did not have vacuum trucks."

Carmant said he called Shemelzman to discuss the plan and that Shemelzman suggested that they meet, but Carmant declined.

Carmant gave the allegedly false version of events to Federal Bureau of Investigations agents who were investigating the fire, but later recanted this story.

Mahland admitted to having one conversation with Carmant regarding what they would tell investigators. She says Carmant told her "to say that 'Metro wasn't involved in this.'" Mahland said at that point she did not know whether and to what extent Metro was involved.

*Criminal Proceedings*

An "over-the-top" transfer of oil or gasoline is a criminal violation of the Ports and Waterways Safety Act and its implementing regulations. *See* 46 U.S.C.App. §§ 3703(a), 3718(b); 46 C.F.R. § 35.35–20. Negligent discharge of oil into navigable waters violates the Clean Water Act. *See* 33 U.S.C. §§ 1319(c)(1) and 1321(b)(3).

Poling Transportation was indicted on four counts of criminal violations of the Ports and Waterways Safety Act and the Clean Water Act. *United States v. Poling Transportation Corp.*, No. 96 CR 853. On January 14, 1997, the corporation, through its counsel, pleaded guilty to two counts: the "over-the-top transfer" of oil, a Class D felony, and negligent discharge of oil into navigable waters, a Class A misdemeanor.

On December 11, 1996, a misdemeanor information was filed in the Eastern District of New York charging Mahland with negligent discharge of oil in violation of the Clean Water Act. *United States v. Janet Poling Mahland*, No. 96 CR 1099. Mahland pleaded guilty on December 11, 1996, and on April 4, 1997, Judge Carol Bagley Amon sentenced her to three years probation and imposed a fine of $6,000.

In her plea colloquy, Mahland admitted that she was negligent with respect to the discharge of oil into navigable waters on August 18, 1995. In particular, she said she instructed her employees to have the vessel cleaned and was negligent in not supervising the process of cleaning out the boat.

## II. THE METRO DEFENDANTS

Plaintiffs assert a common law claim of negligence against Metro. The Metro defendants move for summary judgment on the grounds that (i) they had no duty of care to plaintiffs under these circumstances, and (ii) their actions were not the proximate cause of plaintiffs' injuries.

### A. Summary Judgment

Under Rule 56 of the Federal Rules of Civil Procedure, the moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

Summary judgment is warranted only if "the evidence is such that a reasonable jury could not return a verdict for the nonmoving party." *Id.* Moreover, "the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

The substantive law governing the case will determine those facts that are material, and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

### B. Applicable Law

■ Because plaintiffs were seaman injured upon a vessel in navigable waters, maritime law governs their claims. *See Executive Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249, 253, 93 S.Ct. 493, 497, 34 L.Ed.2d 454 (1972) (maritime jurisdiction established by locality of tort); *Shipping Corp. of India v. American Bureau of Shipping*, 744 F.Supp. 447, 448 n. 1 (S.D.N.Y.1990). Federal maritime law incorporates common-law negligence principles, and New York law in particular. *See*

*International Ore & Fertilizer Corp. v. SGS Control Services, Inc.*, 38 F.3d 1279, 1284 (2d Cir.1994).

 To prevail on a claim for negligence under the general maritime law, "the burden is on the plaintiff to establish duty, breach of duty, causation (both cause in fact and proximate cause) and damages." *Naglieri v. Bay*, 93 F.Supp.2d 170, 174–75 (D.Conn.1999).

### C. Duty

Plaintiffs assert that Metro had a direct duty to them because a Metro employee "arranged" for the removal of oil from the barge. They also argue that Metro had a duty to prevent negligence on the part of Ultimate, whom plaintiffs characterize as an agent or independent contractor to Metro.

*Metro's Negligence*

Plaintiffs first seek to hold Metro directly liable for their own negligence, as distinct from Ultimate's negligence. Relying on *Havas v. Victory Paper Stock Co.*, 49 N.Y.2d 381, 426 N.Y.S.2d 233, 402 N.E.2d 1136 (1980), they assert that the transfer of product from THE CLARA P. was a combined effort among Squadrito, plaintiffs, and Ultimate's driver, Etvar Nugent.

In *Havas*, the plaintiff was injured while assisting employees of the defendant trucking company in loading waste paper from garbage trucks. The hydraulic forklift was broken, and the plaintiff and defendant's employees agreed to use an *ad hoc* method of loading the trucks. The Court of Appeals held that the trucking company was liable because its employees agreed to proceed even though "the shortcomings of the [improvised] method ... were patent." *Id.*, 49 N.Y.2d at 386, 426 N.Y.S.2d at 236, 402 N.E.2d 1136.

*Havas* might be applicable as against Ultimate, the company whose equipment and employees were used in the offloading operation. But it is irrelevant as against Metro except insofar as Metro is liable for Ultimate's actions. Plaintiffs do not assert that any employee of either Metro defendant actually took part in the transfer operation or that these defendants owned or operated any of the equipment used in the operation.

Plaintiffs do allege that Metro exercised control over Ultimate's conduct during the pumping operation. But that claim, if proven, would support a claim of vicarious liability under an agency theory rather than direct liability.

*Vicarious Liability Generally*

 The New York courts are reluctant to impose a duty to anticipate the tortious conduct of third parties. *See Purdy v. Public Adm'r of Westchester Cty.*, 72 N.Y.2d 1, 8, 530 N.Y.S.2d 513, 516, 526 N.E.2d 4 (1988); *Pulka v. Edelman*, 40 N.Y.2d 781, 785–86, 390 N.Y.S.2d 393, 396–97, 358 N.E.2d 1019 (1976). But such a duty exists where there is a special relationship that confers on the defendant either the obligation to control the third person's conduct or to protect the plaintiffs from the harm in question. *See Pulka v. Edelman*, 40 N.Y.2d 781, 783, 390 N.Y.S.2d 393, 395, 358 N.E.2d 1019 (1976).

Plaintiffs contend that such a special relationship existed because Squadrito "arranged for" Ultimate to conduct the pumping operation, and Metro was the intended recipients of the product. The possibility of an agency relationship between Metro and Ultimate is discussed below. But plaintiffs also assert that Metro had a duty to prevent Ultimate's negligence even in the absence of an agency relationship. Specifically, they allege that Metro's duty arose when their employee recommended Ultimate or instructed Poling to retain Ultimate.

 A party who negligently provides false information to another may be liable "for physical harm caused by action taken by the other in reasonable reliance upon such information." Restatement (Second) Torts § 311(1). Such liability may arise where harm results either to the person

who receives the information or to "such third persons as the actor should expect to be put in peril by the action taken." *Id.*

■ To state a claim for negligent misrepresentation, a plaintiff must establish that the "defendant had a duty to use reasonable care to impart correct information because of some special relationship between the parties, that the information was incorrect or false, and that the plaintiff reasonably relied upon the information provided." *Grammer v. Turits*, 271 A.D.2d 644, 706 N.Y.S.2d 453 (2d Dept. 2000).

■ The requisite relationship must include "actual privity of contract between the parties or a relationship so close as to approach that of privity." *Ossining Union Free School District v. Anderson La-Rocca Anderson*, 73 N.Y.2d 417, 419, 541 N.Y.S.2d 335, 335, 539 N.E.2d 91 (1989); *see also International Ore & Fertilizer Corp. v. SGS Control Services, Inc.*, 38 F.3d 1279, 1283, n. 1, 1284 (2d Cir.1994) (maritime law incorporates New York law of negligent misrepresentation). To establish such a relationship, plaintiffs must show (1) that defendants were aware that their statement would be used for a particular purpose; (2) detrimental reliance by a known party on the statement in furtherance of that purpose; (3) some conduct by the maker of the statement linking it to the relying party and evidencing its understanding of that reliance. *See Dorking Genetics v. United States*, 76 F.3d 1261, 1269 (2d Cir.1996).

Under this rule, a defendant is not liable merely for the tortious acts of a third party whom they have simply recommended to the plaintiff, where a party other than the plaintiff actually retained the party inflicting the injury. *See Cohen v. Wales*, 133 A.D.2d 94, 518 N.Y.S.2d 633 (2d Dept.1987) (school district not liable for recommending teacher formerly charged with sexual misconduct).

■ But plaintiffs allege that Metro did more than merely recommend that Poling use Ultimate. Rather, Metro purportedly agreed to accept the product from the barge, called Ultimate to tell them to contact Poling, either recommended or instructed Poling to use Ultimate, and agreed to pay for Ultimate's services.

Such conduct established a relationship between Metro and Poling "sufficiently approaching privity" to render the Metro defendants liable for their misrepresentation. *Security Pacific Business Credit, Inc. v. Peat Marwick Main & Co.*, 79 N.Y.2d 695, 705, 586 N.Y.S.2d 87, 597 N.E.2d 1080 (1992).

Admittedly, the record shows only that Metro may have had a special relationship with Poling. But that relationship would clearly extend to Poling's employees, just as Squadrito's acts may be imputed to Metro. Indeed, plaintiffs' reliance upon Squadrito's representations as to Ultimate's ability to provide the necessary equipment "was a consequence which, to the [defendants'] knowledge, was the end and aim of the transaction." *Glanzer v. Shepard*, 233 N.Y. 236, 238–39, 135 N.E. 275 (1922).

*Ultimate as Metro's Agent*

■ Federal maritime law embraces the principles of agency, *see, e.g., Kirno Hill Corp. v. Holt*, 618 F.2d 982, 985 (2d Cir. 1980), under which "a principal is liable to third parties for the acts of an agent operating within the scope of his real or apparent authority." *Citibank, N.A. v. Nyland (CF8) Ltd.*, 878 F.2d 620, 623–24 (2d Cir. 1989).

■ To establish an agency relationship, a party must show "the manifestation by the principal that the agent shall act for him[;] the agent's acceptance of the undertaking[;] and the understanding of the parties that the principal is to be in control of the undertaking." *Cabrera v. Jakabovitz*, 24 F.3d 372, 386 (2d Cir.1994) (quoting Restatement (Second) of Agency § 1 cmt. b (1958)).

■ The most critical element is that the agent "acts subject to the principal's direction and control," *In re Shulman Transport Enterprises, Inc.*, 744 F.2d 293, 295 (2d Cir.1984), that is, that the principal exercises "day-to-day control" over the "detailed physical performance" of the agent. *United States v. Orleans*, 425 U.S. 807, 814–16, 96 S.Ct. 1971, 1976–77, 48 L.Ed.2d 390 (1976). The Court looks for "the exertion of actual control, not formal indicia of control." *Royal Insurance Company of America v. RU–VAL Electric Corp.*, 918 F.Supp. 647, 653 (E.D.N.Y. 1996).

■ Whether an agency relationship exists under this standard is a mixed question of law and fact. *Cabrera*, 24 F.3d at 385–86. Summary judgment is appropriate "only where application of the law to ... undisputed facts will reasonably support only one ultimate conclusion." *Richardson v. New York State Dept. of Correctional Service*, 180 F.3d 426, 438 (2d Cir. 1999).

■ Material questions of fact remain at least as to the first two elements of agency, that is, whether either Metro or Ultimate expressed an understanding that Ultimate would act as Metro's agent. For example, Carmant stated in his deposition that Squadrito recommended that Poling use Ultimate. But he also said that Squadrito instructed him to call Ultimate and that he understood that Metro would pay for the transport. Yuri Schemelzman, Ultimate's owner, testified that Squadrito called Ultimate to ask if they could help Poling, and that Poling arranged to "lease" a truck from Ultimate.

Carmant, Jurgens and Squadrito also gave conflicting testimony as to whether Metro agreed to accept the product. Likewise, Nugent said he was told by Ultimate's dispatcher to deliver the product to Metro Terminal, while Schemelzman said that Ultimate agreed only to move the product to barrels located on the Poling yard. Squadrito and Thomas Torre both testified that it was physically impossible to deliver gasoline to Metro Terminal by truck, but Nugent and Schemelzman testified that Nugent did just that.

In short, viewed in the light most favorable to plaintiffs, the facts may support a finding that Metro hired Ultimate to help pump the product from the barge and transport it to Metro Terminal. Summary judgment is thus inappropriate on the question of whether the parties understood that Ultimate would act on behalf of Metro.

Whether Metro exercised the requisite control over Ultimate's conduct presents a closer question. The record provides some support for plaintiffs' allegation that Squadrito instructed Ultimate to go to the Poling yard, offload the product, and deliver it to Metro Terminal. There is also evidence that Squadrito agreed that Metro would pay for the transfer.

Witnesses differed as to who would direct the pumping operation. Nugent said he was told to follow the instructions of Poling employees, while Jurgens said he was told "to assist the truck in getting the gasoline off the barge." But there was no direct evidence that in deciding to conduct an over-the-top transfer using a portable pump the men were deferring to instructions from Metro. In fact, both Jurgens and Nugent said Jurgens initially suggested that method.

Nevertheless, the over-the-top transfer was made necessary only because no vacuum truck arrived, and the evidence may support a finding that Metro was responsible for this lapse. In addition, Ultimate's dispatcher instructed Nugent to pick up a coupler before going to the Poling yard. Plaintiffs urge that this order must have originated with Squadrito, since only Squadrito knew both that Ultimate would not be bringing a vacuum truck and the position of THE CLARA P. within the Poling yard. Plaintiffs also note that when Nugent drove to Metro Terminal after the fire, Metro employees specifically instruct-

ed him how and where to offload the product.

These facts may indicate, albeit circumstantially, that Metro had or exercised the right to control the "detailed physical performance" of the operation. *Orleans,* 425 U.S. at 814–16, 96 S.Ct. at 1976–77. Summary judgment dismissing plaintiffs' claim against Metro is thus not appropriate.

### Ultimate as Independent Contractor

Plaintiffs argue that even if Metro retained Ultimate only as an independent contractor, they are vicariously liable for Ultimate's negligence because the transfer operation was an "inherently dangerous activity."

██ An independent contractor, like an agent, is a party hired by a principal or employer. *See* Restatement (Second) of Agency § 1 cmnt. e (1958); *O'Connor v. Davis,* 126 F.3d 112, 115 (2d Cir.1997). Remuneration to the purported contractor by the employer is an "essential characteristic" of the independent contractor relationship. *O'Connor,* 126 F.3d at 115. "[T]he typical test of whether one is an independent contractor [as opposed to a servant or employee] lies in the control exercised by the employer, and in who has the right to direct what will be done and when and how it will be done." *Makarova v. U.S.,* 201 F.3d 110, 114 (2d Cir.2000); *see also* Restatement (Second) of Agency § 220(2).

██ One who hires an independent contractor generally is not liable for the negligence the contractor or its employees. Restatement (Second) of Torts § 409 (1965). But "where the activity performed by the contractor is an inherently dangerous one, the negligence of the contractor may be imputed to the employer." *Alva Steamship Co. v. City of New York,* 616 F.2d 605, 610 (2d Cir.1980).

██ Alternatively, a principal may be liable for hiring a negligent or unqualified independent contractor "provided that the employer either failed to exercise reason-

able care in the selection of the contractor or had actual or constructive knowledge of the contractor's insufficiency." *Waite v. American Airlines, Inc.,* 73 F.Supp.2d 349, 355 (S.D.N.Y.1999); *see also O'Keefe v. Sprout–Bauer, Inc.,* 970 F.2d 1244, 1251 (3d Cir.1992); Restatement (Second) of Agency § 411.

██ It is Metro's position that Squadrito simply suggested that Poling use Ultimate's services, and thus that Ultimate was neither their agent nor an independent contractor. But, as noted, a reasonable jury could conclude that Metro hired Ultimate to help pump the product from the barge and transport it to Metro Terminals.

The Court does note the complete absence of documentary evidence on this issue in the form of invoices, contracts and the like. Torre, Metro Fuel's treasurer, stated in a deposition that both Metro Fuel and Metro Terminal typically issue "delivery tickets" to document fuel transfers made by trucking companies on their behalf, but that he knew of no records of the transaction at issue. Nonetheless, summary judgment on the question of Ultimate's relationship with the Metro defendants is inappropriate in the face of conflicting affidavits and deposition testimony. Fed.R.Civ.P. 56(c).

Metro also asserts that the transfer operation was not an "inherently dangerous activity." Whether an activity is inherently dangerous "is a question of fact to be determined by the fact-finder" as long as "reasonable minds" can differ. *McMillan v. United States,* 112 F.3d 1040, 1044 (9th Cir.1997); *see also Rosenberg v. Equitable Life Assur. Socy.,* 79 N.Y.2d 663, 668, 584 N.Y.S.2d 765, 595 N.E.2d 840 (1992).

A trier of fact could easily find that the removal of the product from THE CLARA P. was inherently dangerous. Plaintiffs' expert, George Reid, stated that offloading gasoline without a vacuum truck posed a risk of fire. The Second Circuit has found that handling gasoline in analogous cir-

cumstances was inherently dangerous. *See Alva Steamship Co. v. City of New York,* 616 F.2d 605, 610 (2d Cir.1980) (salvage of liquid fuel from damaged ship); *see also* 46 C.F.R. § 35.35–20 (requiring special precautions in loading and unloading flammable liquid cargo from tank vessels).

Even if the gasoline transfer was not "inherently dangerous," Metro may have been negligent in selecting an independent contractor that lacked the proper·equipment. *See* Restatement (Second) of Torts § 411, illustration 2 (if employer hires trucking company to haul logs but knew or should have known that company's trucks were unsuitable for work, employer is liable to third party injured by falling logs). It is undisputed that Squadrito knew that Ultimate had no vacuum trucks and that offloading the product without such a truck was unsafe.

There are issues of fact as to whether Metro may be liable on the ground that the offloading was inherently dangerous or for negligence in selecting Ultimate.

### E. Proximate Cause

The Metro defendants argue that their acts did not proximately cause plaintiffs' injuries because they neither created the conditions that led to the accident nor set in motion the over-the-top transfer. Similarly, they argue that the negligence of Poling and its employees were superseding causes of the injuries.

■ "Proximate cause ... limits a defendant's liability to those foreseeable consequences that the defendant's negligence was a substantial factor in producing." *Bonsignore v. City of New York,* 683 F.2d 635, 637 (2d Cir.1982).

■ The chain of legal causation is broken by "a later cause of independent origin that was not foreseeable." *Exxon Co. U.S.A. v. Sofec, Inc.,* 517 U.S. 830, 837, 116 S.Ct. 1813, 1818, 135 L.Ed.2d 113 (1996) (quoting 1 T. Schoenbaum, Admiralty and Maritime Law § 5–3, pp. 165–66 (2d ed.1994)). The foreseeable intervening

negligence of a plaintiff or a third party "may reduce, but does not bar, recovery for personal injuries, that is, the plaintiff's recovery is reduced in proportion to his own fault." *Pope & Talbot, Inc. v. Hawn,* 346 U.S. 406, 408–09, 74 S.Ct. 202, 98 L.Ed. 143 (1953).

■ Metro relies on·a series of decisions denying recovery to plaintiffs injured under conditions created because the defendant supplied defective equipment. *Benaquista v. Municipal Housing Auth.,* 212 A.D.2d 860, 622 N.Y.S.2d 129 (2d Dept. 1995) (defendant landlord's defective intercom not the proximate cause of plaintiff's fall in stairwell); *see also Ferguson v. Callanan Ind.,* 223 A.D.2d 862, 636 N.Y.S.2d 207 (3d Dept.1996) (defendant's inoperative equipment not the proximate cause of injuries sustained when plaintiff used alternative means of accomplishing task); *McMahon v. ConAgra, Inc.,* 1992 WL 131115 (W.D.N.Y.1992) (same).

These decisions support the proposition that a defendant is not liable who "merely furnished the condition or occasion upon which plaintiff's injuries were received but did not put in motion the agency by which the injuries were inflicted." *Benaquista,* 622 N.Y.S.2d at 129. In *Ferguson,* for example, the defendant supplied defective equipment to plaintiff's employer, but "took no part in the decision" to have plaintiff perform a task usually made less dangerous by defendant's equipment. 636 N.Y.S.2d at 208.

But plaintiffs seek to hold Metro vicariously liable for Ultimate's negligence. And Ultimate's employees allegedly did not merely create the conditions under which plaintiffs were injured, that is, the absence of a vacuum truck. They also allegedly helped plaintiffs "put in motion the agency" causing plaintiff's injuries, namely, the over-the-top transfer. *Cf. Benaquista,* 622 N.Y.S.2d at 129.

Moreover, the Metro defendants themselves allegedly had a hand in proceeding

with the transfer despite the lack of proper equipment. Plaintiffs contend that Squadrito knew that THE CLARA P.'s pumps were inoperative and that Ultimate had no vacuum trucks, but nonetheless requested that Ultimate help offload and transfer the product. *Cf. Lopez v. A/S/D/S Svendborg*, 581 F.2d 319, 325 (2d Cir.1978) (defendant ship owner is liable where he knew of danger but had plaintiff stevedore continue working or joined in their decision to do so); Restatement (Second) of Torts § 413 (1965) (employer of independent contractor liable for injuries caused by dangerous work of which employer was aware and for which employer failed to take precautions).

Similarly, any intervening negligence on plaintiffs' part was foreseeable. Plaintiffs' expert testified that a risk of fire was inherent in any procedure to remove gasoline from the boat without the proper equipment. Nonetheless, Squadrito allegedly arranged for Poling and Ultimate to complete the transfer without a vacuum truck. In these circumstances, it cannot be said that "the subsequent actor's negligence was 'extraordinary' (defined as 'neither normal nor reasonably foreseeable')." *Exxon*, 517 U.S. at 835, 116 S.Ct. at 1817 (citations omitted).

Since there are triable issues of fact as to Metro's liability, summary judgment is inappropriate.

## IV. MAHLAND'S MOTION

Mahland moves for summary judgment on the grounds that plaintiffs have no claims against her under either the Jones Act or the unseaworthiness doctrine; that general maritime law bars an action by a seaman against a fellow employee; and that her acts were neither negligent nor the proximate cause of plaintiffs' injuries.

*Jones Act and the Fellow Servant Doctrine*

The Jones Act, 46 U.S.C.App. § 688, allows a seaman to seek recovery from his or her employer for injuries caused by the employer's negligence. The Jones Act provides a right of action only against a seaman's "employer." *Cosmopolitan Co. v. McAllister*, 337 U.S. 783, 789, 69 S.Ct. 1317, 1321, 93 L.Ed. 1692 (1949); *Mahramas v. American Export Isbrandtsen Lines, Inc.*, 475 F.2d 165, 170 (2d Cir. 1973).

■■■■ "[T]he Jones Act provides the exclusive recovery in negligence for claims by seamen against their employers." *Ellenwood v. Exxon Shipping Co.*, 984 F.2d 1270, 1283 (1st Cir.1993). "Employers" under the Jones Act include "those standing in the proximate relation of employer," *Cosmopolitan Co. v. McAllister*, 337 U.S. 783, 790, 69 S.Ct. 1317, 1321, 93 L.Ed. 1692 (1949), including the employer's "officers, agents, or employees." *Hopson v. Texaco, Inc.*, 383 U.S. 262, 263, 86 S.Ct. 765, 766, 15 L.Ed.2d 740 (1966).

■■■■ The Jones Act does not bar negligence actions by seaman against non-employer third parties under general maritime law. But general maritime negligence actions against fellow employees are barred by the fellow servant doctrine. *McAleer v. Smith*, 57 F.3d 109, 116 (1st Cir.1995).

Plaintiffs apparently concede that they may not sue Mahland either for negligence under the Jones Act or for unseaworthiness. But they contend she may be held liable for negligence under the general maritime law as a non-employer third party.

Plaintiffs seek to avoid the fellow servant rule by arguing that the parties worked for different employers. They allege that Becker and Jurgens were employees of Chester A. Poling, while Mahland is sued in her capacity as president or corporate officer of Poling Transport or Motor Vessel Poling Bros. No. 9.

But a seaman employed by one entity may be considered a temporary or shared employee for purposes of the Jones act under the doctrines of "borrowed" and "dual" servants. *See Kelley v. Southern*

*Pacific Co.*, 419 U.S. 318, 324, 95 S.Ct. 472, 476, 42 L.Ed.2d 498 (1974) (applying Federal Employers' Liability Act); *Kernan v. American Dredging Co.*, 355 U.S. 426, 439, 78 S.Ct. 394, 401, 2 L.Ed.2d 382 (1958) (Jones Act incorporates "the entire judicially developed doctrine of liability" under the Federal Employers' Liability Act); *Walker v. Braus*, 995 F.2d 77 (5th Cir. 1993) (applying borrowed servant doctrine under Jones Act).

■ A borrowed servant is one "directed or permitted by his master to perform services for another." Restatement (Second) of Agency § 227; *Williamson v. Consolidated Rail Corp.*, 926 F.2d 1344, 1349 (3d Cir.1991). A "dual servant" is the servant "of two masters ... at one time as to one act, if the service to one does not involve abandonment of service to the other." Restatement (Second) of Agency § 226; *Williamson*, 926 F.2d at 1349.

Under either rule, an employee-employer relationship is not established for Jones Act purposes unless the employer "had the power to control, manage and direct the servant in the performance of [the seaman's] work." *Addison v. Gulf Coast Contracting Servs.*, 744 F.2d 494, 499 (5th Cir.1984); *see Kelley*, 419 U.S. at 324, 95 S.Ct. at 476.

Whether the requisite control was present turns on several factors, most importantly who exercised "significant supervisory control" over the operation in which the plaintiff was injured. *Kelley*, 419 U.S. at 327, 95 S.Ct. at 477. The Court also looks to "who selected and engaged the plaintiff to do the work; ... and who furnished the tools with which the work was performed and the place of work." *Williamson*, 926 F.2d at 1349.

■ It is unclear on the present record whether Becker and Jurgens, as crew members of THE ANTHONY J., were employed by Chester A. Poling or Poling Transportation. But the record clearly shows that, at the time of the accident, plaintiffs were borrowed or dual servants of the corporation that controlled the unloading operation. That entity employer was either Motor Vessel Poling Bros. No. 9, which owned THE CLARA P., or of Poling Transportation, its parent corporation.

On the day of the accident, Mahland told Carmant, a Poling Transportation employee, to have THE CLARA P. cleaned out in preparation for its sale. Carmant, in turn, told Jurgens to pump water from a storage tank using a portable hand pump and to determine how much product was in the slop tanks. He later "left instructions for the crew of the ANTHONY J. to do whatever ... was needed" in the pumping operation.

Even without resort to agency law, the undisputed facts also show that Mahland, at the time she committed acts charged in the complaint, was acting as an officer of the same corporate entity as plaintiffs. She was president of Chester A. Poling, Poling Transportation, and Motor Vessel Poling Bros. No. 9. She negotiated the sale of the barge, agreed to have the boat's tanks cleaned, and instructed Carmant to make the necessary arrangements. In her capacity as president of Poling Transportation, Mahland was subsequently indicted and pleaded guilty for Clean Water Act violations committed in connection with that cleaning operation.

In short, at the time of the fire, either plaintiffs and Mahland were fellow servants or Mahland was the agent of plaintiffs' employer. In either event, plaintiffs may not recover for Mahland's negligence except through a suit against their employer under the Jones Act. *See Ellenwood*, 984 F.2d at 1283 (Jones Act provides "exclusive recovery in negligence for claims by seamen against their employers"); *Hopson*, 383 U.S. at 263, 86 S.Ct. at 766 ("employer" under the Jones Act includes "officers [or] agents" of nominal employer).

Plaintiffs next contend that even if the parties were employed by the same corpo-

ration, the fellow-servant doctrine in maritime law only bars suits by a seaman against the master of his vessel or fellow crew members. Mahland indisputably was not the master of a vessel or a fellow crew member.

It is true that the rule as applied to seaman is often phrased in the language urged by plaintiffs. *See, e.g., The Osceola,* 189 U.S. at 175, 23 S.Ct. at 487 ("all the members of the crew ... are, as between themselves, fellow servants, and hence seamen cannot recover for injuries sustained through the negligence of another member of the crew"). But plaintiffs have not cited, and the Court could not locate, any decision allowing a seaman to bring a negligence action against a fellow corporate employee, as distinct from a fellow crew member, without running afoul of the fellow servant doctrine and the Jones Act.

As noted, the Jones Act allows recovery for the negligence of "those standing in the proximate relation of employer," *McAllister,* 337 U.S. at 790, 69 S.Ct. at 1321, including the employer's "officers [or] agents." *Hopson,* 383 U.S. at 263, 86 S.Ct. at 766.

Under plaintiffs' view of the fellow servant doctrine, a seaman could recover against the officer of a corporation under both the Jones Act and the general maritime law. Such a rule would be contrary to both the Jones Act, which provides the "exclusive recovery in negligence" for claims against an employer and its officers or agents, *Ellenwood,* 984 F.2d at 1283, and the fellow servant doctrine.

*Mahland's Personal Liability for Corporate Acts*

Plaintiffs also argue that Mahland may be held personally liable under New York law for negligent acts undertaken in her corporate capacity.

█ Under both state and maritime law "a corporate officer who commits or participates in a tort, even if it is in the course of his duties on behalf of corporation, may be held individually liable." *Lo-*

*presti v. Terwilliger,* 126 F.3d 34, 42 (2d Cir.1997); *see also Armada Supply Inc. v. S/T Agios Nikolas,* 613 F.Supp. 1459, 1471 (S.D.N.Y.1985) (applying maritime law).

But this rule does not create a distinct basis for holding any party liable; it merely allows recovery from a different source. As seaman injured in the course of their employment, plaintiffs still must seek recovery for negligence under either the Jones Act or general maritime law.

█ In other words, holding Mahland personally liable would not transform the suit from a Jones Act claim against an employer to a general maritime action against a non-employer third party. It simply would place Mahland in the shoes of the corporation that otherwise may be liable as plaintiffs' employer.

But a Jones Act claim lies only against the employer, and the employer is liable for corporate acts and the acts of its officers, agents and employees. *See Mahramas v. American Export Isbrandtsen Lines, Inc.,* 475 F.2d 165, 170 (2d Cir. 1973). "[O]nly one person, be it an individual or a corporation, [may] be sued as the employer." *Id.*

Unless plaintiffs could establish that Mahland was the alter ego of plaintiffs' "borrowed" employer, they cannot hold her liable under the Jones Act. *Cf. Williams v. McAllister Bros., Inc.,* 534 F.2d 19, 21 (2d Cir.1976) (plaintiff may hold parent corporation liable as alter ego to Jones Act employer); *Guillie v. Marine Towing, Inc.,* 670 So.2d 1298, 1303 (La. App.1996) (corporate officer could not be held individually liable under Jones Act without piercing the corporate veil); *Palladino v. VNA of Southern New Jersey, Inc.,* 68 F.Supp.2d 455, (D.N.J.1999) (corporate officers were not "employers" for purposes of False Claims Act in absence of allegations sufficient to pierce corporate veil). Recovery for Mahland's negligence, if any, must be sought from the corporate Poling parties. Mahland's motion for summary judgment is therefore granted.

## V. PLAINTIFFS' MOTION

Plaintiffs seek summary judgment on the issue of Mahland's liability, arguing that her guilty plea in *United States v. Mahland* has preclusive effect on the question of her negligence with respect to the fire on THE CLARA P.

Mahland's motion for summary judgment having been granted, plaintiffs' cross-motion for partial summary judgment is dismissed as moot.

## VI. SUMMARY

The Metro defendants' motion for summary judgment is denied. Mahland's motion for summary judgment is granted. Plaintiffs' motion for partial summary judgment is denied.

So ordered.